**UNITED STATES of America,**
**Appellee,**

v.

**Anthony N. ARMOCIDA a/k/a**
**"Sonny," et al.**

**Appeal of George Joseph GAZAL.**

**No. 74–1091.**

United States Court of Appeals, Third Circuit.

Argued Nov. 14, 1974.

April 11, 1975.

**51**

Peter M. Shannon, Jr., Reuben H. Wallace, Jr., Washington, D. C., Richard L. Thornburgh, U. S. Atty., Carl L. Lo Presti, Pittsburgh, Pa., for appellee.

Martin M. Sheinman, Kirk, Lalama & Sheinman, Pittsburgh, Pa., for appellant George Joseph Gazal.

Before VAN DUSEN, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

HUNTER, III, Circuit Judge:

In this opinion we consider the appeal of George Joseph Gazal, who was convicted along with appellants Armocida, Conti and Joseph after a jury trial in the Western District of Pennsylvania.[1] Gazal was convicted of conspiring to distribute heroin in violation of 21 U.S.C. § 841 (Count 1), three counts of distributing heroin (Counts 3, 4 and 5) and one count of using a telephone to facilitate distribution (Count 15). He was fined $25,000 on Count 1, and was sentenced to concurrent terms of fifteen years imprisonment on that count and on each of the three distribution counts. He also received a sentence of four years on Count 15, to run concurrently with the sentence imposed on Count 1. Gazal raises four issues in this appeal, but we believe that none of them has merit.

## I. VIOLATION OF PENNSYLVANIA LAW

▮ Gazal first contends that his conviction must be reversed because federal agents recorded telephone conversations of his by means of an induction coil, in violation of Pennsylvania law and not pursuant to any court authorization. Appellant contends that, although one of the parties to the conversation may have

---

1. The appeals of Armocida, Conti and Joseph are treated in United States v. Armocida, et al., Nos. 74–1090, 74–1146, 74–1253, filed on the same date as this opinion. The basic outline of the conspiracy is set out in United States v. Armocida, et al., and will not be repeated here. Where appropriate below, this opinion will amplify the facts pertaining to Gazal's involvement.

consented to the recordings (the agent or the Government informant), Pennsylvania law prohibits use of an induction coil unless *both* parties consent.[1a] Assuming *arguendo* that these recordings were made in violation of Pennsylvania law, that would not necessarily affect their admissibility in this case. So long as the information was lawfully obtained under federal law and met federal standards of reasonableness, it is admissible in federal court despite a violation of state law. *On* Lee v. United States, 343 U.S. 747, 754–55, 72 S.Ct. 967, 96 L.Ed. 1270 (1952); Olmstead v. United States, 277 U.S. 438, 469, 48 S.Ct. 564, 72 L.Ed. 944 (1928).[2]

■ We agree with the Government that the warrantless recording of a telephone conversation with the consent of only one of the parties is perfectly proper under federal law and that the transcript of such a conversation may be admitted into evidence in a federal prosecution. 18 U.S.C. §§ 2511(2)(c) and 2517(3), taken together, specifically authorize the admission into evidence of warrantless recordings of this type.[3] We recently upheld the constitutionality of 18 U.S.C. § 2511(2)(c) and affirmed a conviction of a defendant whose conversations, like those of Gazal, had been recorded with the consent of a Government agent and replayed at trial. United States v. Santillo, 507 F.2d 629 (3d Cir., 1975).

## II. MINIMIZATION

Gazal's second contention is that the Government agents violated the specific limitations contained in Judge Teitelbaum's order,[4] and that all the information obtained pursuant to those taps should have been suppressed. However, we believe that this contention, like that of Armocida, is without merit. Statistics provided by the Government and stipulated to below show that 454 conversations conducted on Gazal's phone were intercepted,[5] of which 153 interceptions were terminated before completion of the call and 301 calls were listened to in their entirety. 84 of the conversations intercepted primarily involved gambling or numbers activities,[6] while 14 were

---

1a. Appellant relies on Commonwealth v. McCoy, 442 Pa. 234, 275 A.2d 28 (1971), construing 18 P.S. § 3742 (now §§ 5701–04).

2. We need not concern ourselves with appellant's suggestion that affirmance here might make it permissible for federal agents to commit such crimes as burglary or larceny in order to investigate a potential federal violation. Evidence obtained through burglary or larceny would surely fail to meet federal standards of reasonableness.

3. 18 U.S.C. § 2511(2)(c) provides:

It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

In each case a Gazal conversation was recorded by the induction coil, the recording was made with the consent of one of the parties.

18 U.S.C. § 2517(3) provides in part that any person who has received information "by any means authorized by this chapter" may disclose such information in a criminal proceeding.

4. In addition to the warrantless recordings of Gazal's conversations made with the consent of one of the parties, Judge Teitelbaum issued an order on August 30, 1972 permitting wiretapping of Gazal's phone. Conversations involving Gazal were also picked up on the taps placed on Armocida's and Conti's phones, authorized by Judge Teitelbaum on September 19, 1972.

The written order of August 30 authorizing the Gazal tap, like the September 19 order authorizing the Armocida and Conti taps, included a limitation phrased essentially in the statutory language. It provided that the intercept "shall be conducted in such a way as to minimize the interception of communication not subject to interception under Chapter 119 of Title 18 of the United States Code. . . ."

5. The total number of calls intercepted, including busy signals, misdials, no answer, etc., was 707. See August 10, 1973, Tr. at 5.

6. There was some disagreement at the August 10 suppression hearing before Judge McCune as to whether any of the 84 gambling conversations had been terminated before completion. Counsel for Gazal argued that they had been intercepted in full, whereas agent James Greene testified that many had been terminated. Agent Greene was unable, however, to

calls of a personal nature. At the hearing on August 10, 1973, counsel for Gazal argued for suppression solely on the basis that the agents had intercepted 84 gambling conversations and 14 personal ones, with his argument resting primarily on the alleged impropriety of intercepting the gambling conversations (N.T. 12–13).[7] He did not challenge the propriety of the remaining intercepts or seek to introduce evidence as to the nature or length of any of those other conversations. Consequently, our review on this appeal is limited to the question of whether the agents violated the limitations contained in Judge Teitelbaum's order by intercepting the 84 gambling conversations and the 14 personal ones.

■ With respect to the gambling conversations, we believe that there was no failure of minimization requiring suppression, since we conclude that the agents made a good faith effort to minimize. As we noted in United States v. Armocida, et al., Nos. 74–1090, 74–1146, 74–1253 (3d Cir., 1975), electronic surveillance, by its very nature, cannot be conducted without some interception of conversations which, through the benefit of hindsight, appear innocent. The proper focus is on the reasonableness of the agents' conduct at the time of the intercepts, given the extent of their knowledge of the case and of the activities of the suspects. The agents' conduct must also be measured against the possibility that seemingly innocuous conversations might be coded and that a conversation which appears innocent at first may later turn to a discussion of criminal activity.

■ In this case, agent Greene testified at the suppression hearing that some gambling calls turned to other matters, which the agents believed at the time could involve narcotics (N.T. 30–32); that Gazal had used coded lan-

guage in his dealings with the undercover agent, and thus the agents suspected that the intercepted conversations might likewise contain hidden reference to narcotics (N.T. 32, 40, 43); that at least 15 gambling-related interceptions were terminated, after the agents had been able to ascertain that calls made by Gazal to those other individuals never turned to discussions of narcotics (N.T. 22, 35); and that many of the gambling conversations intercepted were between the same suspects under investigation for dealing in narcotics (N.T. 34). Under these circumstances, we cannot say that the agents' conduct in intercepting the gambling calls was a failure to minimize which requires suppression.

■ Likewise, we find no failure of minimization regarding the personal conversations. Some of these made references to items which the agents thought might be code references to narcotics (N.T. 39–44). Several were of short duration, two being less than a minute (N.T. 49, 52), and three lasting less than 15 seconds (N.T. 54). Two involved discussions between Mrs. Gazal and another woman, speculating on the identity of "John Crober" (the alias Gazal had used in his dealings with undercover agent Dreisbach, and the person Dreisbach had asked for when he called the Gazal home) and on the identity of "Bobby Jackson" (the alias used by Dreisbach) (N.T. 45–47). It was thus reasonable for the agents to assume, at the start of those conversations, that they might reveal some information about Gazal's narcotics activities. Another intercept was terminated before completion (N.T. 54). Finally, the personal conversations totalled only 14 in number. These circumstances do not suggest an extensive or unreasonable interception of private conversations. We thus conclude that the agents neither violated Judge Teitelbaum's order[8] nor failed to make a good

provide proof from the logs of the gambling conversations that some had been terminated, but he stated that he thought he could do so if he was given enough time to go through all of the logs. (August 10, 1973, Tr. at 23–25, 63).

7. All reference to the transcript in Part II of this opinion are from the August 10, 1973, suppression hearing before Judge McCune.

8. We also believe that there was substantial compliance with Judge Teitelbaum's oral in-

faith effort to minimize interception of innocent conversations.

## III. BILL OF PARTICULARS

Gazal makes essentially two contentions here. First, he argues that he was prejudiced by the trial court's refusal to direct the Government to furnish him with a bill of particulars listing "any other overt acts committed, setting forth when, where and how it was committed, which were not set forth in the indictment." Noting that the indictment specified only three individuals to whom he allegedly distributed heroin, he claims he was surprised and unfairly prejudiced by the testimony of a fourth individual, Alvin Clark, that Gazal had distributed heroin to him on one occasion and had made arrangements to provide Clark with heroin on two other occasions.

 This contention is without merit. It is well established, both in this Circuit and elsewhere, that decisions to grant bills of particulars lie within the discretion of the trial court, and that a conviction may be reversed only where the denial of the bill constituted an abuse of discretion. United States v. Addonizio, 451 F.2d 49, 63–65 (3d Cir., 1971), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). See also Chadwick v. United States, 117 F.2d 902, 904 (5th Cir.), cert. denied, 313 U.S. 585, 61 S.Ct. 1109, 85 L.Ed. 1541 (1941). We find no abuse of discretion here. Appellant's request for the "when, where and how" of any overt acts not alleged in the indictment was tantamount to a request for "wholesale discovery of the Government's evidence," which is not the purpose of a bill of particulars under Fed.R. Crim.P. 7(f). Addonizio, supra 451 F.2d at 64; United States v. Lebron, 222 F.2d 531, 535–36 (2nd Cir., 1955). Furthermore, appellant has not specified any prejudice to his case or shown what he would have done differently had he known that Clark was going to testify. The fact that Clark's testimony may have been damaging to his case does not establish prejudice, since prejudice would have to arise from appellant's *unawareness* that Clark would testify, not from the *fact* that he testified or that his testimony was damaging. Furthermore, the record tends to refute Gazal's contention that he was surprised. Prior to Clark's testimony three separate FBI agents had described meetings between Gazal and Clark (agent Smith, N.T. 1547–49, 1552; agent Winovitch, N.T. 1902–05, 1906–07; and agent Weatherbee, N.T. 1912).[9] Consequently, as the trial court noted, the meetings to which Clark testified had already been placed into evidence to some extent by other witnesses (N.T. 4005).

 Gazal's second contention here was that the Government precluded it-

---

structions, since the agents' conduct still must be measured against the standard of reasonableness, and since the oral instructions, like the written order, must be construed in light of the practical difficulties faced by the agents in discriminating between possibly relevant and irrelevant conversations. Judge Teitelbaum noted these difficulties himself when he stated:

> If innocent words are being used which you believe to mean something else, and you can so testify, there is certainly nothing wrong in listening to that.

While Judge Teitelbaum proceeded to state that the agents would risk suppression of the entire conversation by listening to conversations which they should not listen to, we construe this admonition as binding only to the extent that the agents failed to act reasonably and in good faith in attempting to minimize tapping. As we noted above, a conclusion in hindsight that some conversations were irrelevant does not mandate suppression if the agents show, as they have done here, that they acted reasonably at the time. Also, while the agents appear to have listened to conversations involving other members of the Gazal household despite Judge Teitelbaum's oral instructions not to do so, we do not believe that such conduct requires suppression of the entire intercept. Interceptions of conversations involving family members were very few in number (the transcript of the August 10 suppression hearing reveals only four conversations of this type), and several of them could reasonably be construed as pertaining to the narcotics activities under investigation (N.T. 41–42, 45–47).

9. All references to the transcript in parts III and IV of this opinion are to the trial transcript.

self from introducing Clark's testimony by its response to his request number 11, in which he asked:

As to the conspiracy counts, exactly what George Joseph Gazal is alleged to have done other than that as set forth as overt acts in Count 1 and Count 2 of the indictment.

The Government responded to this request by stating:

As to the conspiracy counts in the indictment, what the defendant Gazal is *alleged* to have done is already alleged in the indictment.

Count 1 of the indictment alleged that Gazal and his co-defendants "did combine, conspire, confederate and agree together, with each other, and with divers *other persons* whose names are to the Grand Jury, known and unknown, to distribute heroin. . . . " (Emphasis added.) Thus, all the acts Gazal was *alleged* to have done were set forth in the indictment, and the Government's response to request number 11 was neither inaccurate nor misleading. Consequently, the Government was not precluded, by its response to that request, from introducing Clark's testimony.

## IV. ENTRAPMENT

■ Gazal's final contention is that the trial judge erred when he failed to charge the jury that the Government had the burden of proof of showing that the defendant was not entrapped, as required by Government of the Virgin Islands v. Cruz, 478 F.2d 712, 717 n. 5 (3d Cir., 1973). The Government acknowledges that the charge was in error, but contends that the error was harmless, since Gazal was not entitled to an instruction on entrapment in the first place. We agree.

■ In United States v. Watson, 489 F.2d 504 (3d Cir., 1973), this Circuit adopted the two-pronged test established by the Second Circuit in United States v. Riley, 363 F.2d 955, 958–59 (2nd Cir., 1966), for determining whether a defendant is entitled to an entrapment charge:

The charge must be given, however unreasonable the judge would consider a verdict in favor of the defendant to be, when the accused shows (1) evidence that the Government initiated the crime, regardless of the amount of pressure applied to the defendant, and (2) any evidence negating the defendant's propensity to commit the crime. *Watson, supra* 489 F.2d at 509. It is clear from this test that *both* prongs must be satisfied before a defendant is entitled to an entrapment charge. As the Second Circuit stated in *Riley:*

[E]ven when inducement has been shown, submission to the jury is not required if uncontradicted proof has established that the accused was "ready and willing without persuasion" and to have been "awaiting any propitious opportunity to commit the offense." In such cases there is no real issue for the jury even though in strict theory it might create one by speculating that the agents had found the defendants less willing than they said.

*Riley, supra* 363 F.2d at 959.

■ The facts of this case show that, although the agents might arguably have initiated the crimes, there was no evidence negating any propensity on the part of Gazal to deal in narcotics. This case began when a Government informant, Louis Eboli, was instructed by federal agents to contact Gazal to tell him that he (Eboli) had a friend who was a drug salesman and who could provide Gazal with quinine (a legal substance which is used to dilute heroin). That "salesman" was Robert Dreisbach, an undercover agent using the alias "Bobby Jackson." It was to Dreisbach that Gazal, after a couple of months of discussions, eventually provided the heroin. Since Gazal did not testify on his own behalf, all the evidence at trial pertaining to the Dreisbach-Gazal transactions, besides the recordings, came from testimony by Dreisbach, and none of his testimony, either on direct or cross-examination, has any tendency to negate

propensity on the part of Gazal to deal in narcotics. On the contrary, Dreisbach's testimony indicates that Gazal was a knowing and willing participant in the transactions from the start.

Dreisbach's testimony was essentially as follows: When he first met with Gazal on June 16, 1972, the latter asked for both quinine and pharmaceutical cocaine (N.T. 79–80, 85–87). When the two met again on June 19, 1972 Dreisbach delivered the quinine and asked if Gazal could provide heroin in return.[10] Gazal replied that he might be able to obtain some heroin, but that "he would have to check with his people" (N.T. 96). Dreisbach informed Gazal that he would provide more quinine if Gazal could deliver an ounce of heroin (N.T. 97–98). When the two spoke again on June 21, Gazal said that he had been unable to contact "his people" about the heroin (N.T. 102–05). When they met later, on July 17, Dreisbach again inquired about heroin. Gazal replied that he did not bring any because the heroin "his people" had at the time was of poor quality, but that he might be able to get a "good ounce" the following week (N.T. 107). On both July 21 and July 27, Gazal told Dreisbach that he did not have any heroin because "his people" had not obtained any yet (N.T. 109, 112). On the latter date, he explained that he expected that "his people" would get a package in a few days. On August 17, Gazal called Dreisbach and arranged a meeting, at which Gazal told Dreisbach that he might be able to provide some heroin later that night (N.T. 116). Later that night, however, Gazal told Dreisbach that he could not get the heroin because "[m]y people are feeling too much heat and can't get to their stash," but he promised to call the next day (N.T. 117). Finally, on August 17, Gazal provided Dreisbach with one ounce of 100% pure heroin.

This evidence shows that, while it may have taken a couple of months of discussions before Gazal eventually provided the heroin, the delay was not due to any reluctance on Gazal's part. Rather, Gazal attributed the delay entirely to problems getting heroin from "his people." Either they had no heroin at all, or it was of poor quality, or "his people" were "feeling too much heat." Furthermore, while Dreisbach may have been the one to initiate the discussions on heroin, there is simply no evidence negating *propensity* on Gazal's part to provide the heroin. Rather, the evidence suggests that he was completely willing to provide it once he could obtain it from "his people." Gazal could have presented evidence negating propensity either through his own testimony, by cross-examining Government witnesses or by any other means, but he failed to do so. See Kadis v. United States, 373 F.2d 370, 374 (1st Cir., 1967). At most, the evidence to which Gazal directs us falls short of creating a jury question on the issue of propensity. See Pierce v. United States, 414 F.2d 163, 168 (5th Cir.), cert. denied 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969).

Since under the test adopted by *Watson, supra,* Gazal was not entitled to an entrapment charge at all, the trial judge's failure to give the proper charge on the burden of proof on the entrapment defense can only be harmless error. In fact, by permitting defense counsel to argue the defense of entrapment to the jury and by charging the jury on entrapment (omitting only the burden of proof element), the trial judge gave appellant more than he was entitled to. Since, on the facts of this case, we could not reverse if the trial judge had refused to give *any* entrapment charge, we cannot see why reversal would be required where the trial judge gave an *incomplete* entrapment charge.

The judgment of the district court as to appellant Gazal will be affirmed.

---

10. Dreisbach asked for "junk," and Gazal responded by asking if he meant "horse." Dreisbach testified that both terms referred to heroin (N.T. 96, 100–01).