**UNITED STATES of America**

v.

**Rudolph FELIZIANI a/k/a "Sonny".**

**Crim. No. 78–165–2.**

United States District Court,
E. D. Pennsylvania.

June 5, 1979.

Peter F. Vaira, U. S. Atty., Robert C. Fourr, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

W. Donald Sparks, Media, Pa., for defendant.

### MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

■ The defendant, Rudolph Feliziani, was found guilty by a jury on two counts of a three-count indictment charging him with participating in the conduct of the affairs of the Chester Police Department through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c),[1] conspiracy to participate in the conduct of the affairs of the Chester Police Department through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d), and conspiracy to obstruct law enforcement with the intent to facilitate an illegal gambling business in violation of 18 U.S.C. § 1511. This, the second trial of the defendant, consumed eight days before a sequestered jury. The first trial, wherein the defendant was tried together with Mayor Nacrelli, ended in a hung jury after twenty-two days before a sequestered jury. When the second trial of both defendants commenced, the defendant, Feliziani, became ill; a severance was granted and the trial of Mayor Nacrelli proceeded without the defendant, Feliziani. The defendant has filed motions, in the alternative, for arrest of judgment, judgment of acquittal, and a new trial. The Court has considered these motions without the benefit of a transcript.[2] For the reasons hereinafter set forth, these motions will be denied.

### I. *MOTION FOR ARREST OF JUDGMENT.*

In his motion for arrest of judgment, defendant merely paraphrases the language of Rule 34, that "the indictment does not charge an offense or the Court was without jurisdiction of any offense so charged." The defendant has provided nothing further in support of these contentions, and the court finds them to be without merit. Therefore, the defendant's motion for arrest of judgment is denied.

### II. *MOTION FOR JUDGMENT OF ACQUITTAL.*

In support of his motion for judgment of acquittal, the defendant contends that the evidence was insufficient to support a guilty verdict as to any count. We find

---

1. The defendant was acquitted on this count.

2. The defendant has requested an extension of time to supplement his motions upon receipt of the transcript, but has not yet ordered the transcript. His request will therefore be denied.

that the evidence produced at trial, viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Armocida,* 515 F.2d 29, 46 (3d Cir.), *cert. denied,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975), is more than sufficient to support the verdict. The evidence presented at trial, viewed in the light most favorable to the government, may be summarized as follows:

■ Herman Hunt Fontaine and Frank Howard Miller operated an illegal gambling business, a numbers game, in Chester for a period of ten years or more. Their operation had in excess of sixty writers and a gross take of $25,000 per day at its peak.

In 1968 and 1969, the Miller-Fontaine operation was experiencing a number of arrests by the Chester city police. John Nacrelli, a close associate of both Fontaine and the defendant, was appointed Mayor of the City of Chester in 1968 and elected to that position in 1969. Through the Mayor, Miller and Fontaine arranged to meet with Joseph Eyre, the former Mayor and Republican City Chairman of the City of Chester. Through Eyre, Miller and Fontaine arranged for police protection of their numbers racket. In return for a payment of $1,600 per month, which Eyre split with Mayor Nacrelli, the Mayor arranged for the Chester police to protect Miller and Fontaine's operation while arresting their opposition. In 1971 the payments were increased to $4,000 per month which Eyre said would include protection from state and county arrests. On December 28, 1976, Joseph Eyre died. Shortly thereafter, Mayor Nacrelli met with Miller and Fontaine and arranged to receive a payment of $2,000 per month, in return for which he would provide police protection for the Miller-Fontaine operation in the City of Chester. Mayor Nacrelli also agreed that the Chester police would arrest numbers writers who were in competition with Miller and Fontaine.[3]

Fontaine delivered the $2,000 monthly payments directly to the Mayor in Decem-

ber, 1976 and January, 1977. Then, because Fontaine was reluctant to deliver money directly to the Mayor, and because the FBI investigation was becoming more intense, the Mayor arranged for payments to be delivered to him through the defendant, Feliziani. Feliziani, who was a city employee with an office directly adjacent to the Mayor, also wrote numbers for Frank Miller. From February through July, 1977, Miller and Fontaine delivered the money to the defendant at a store he operated in Chester township. They gave the defendant $2,000 in large bills, and he counted it each time. When Miller delivered money to the defendant, he invariably asked him why the opposition was not being arrested, asking the defendant to convey this message to the Mayor.

In March 1977, Chief of Police Wright died suddenly. William Hoopes was temporarily appointed by the Mayor to take his place. Hoopes and the other two highest ranking officers who were under consideration for the Chief's position were reluctant to accept the position without an assurance from the Mayor that he would give them a free hand to run the police department. Hoopes took the position with such assurance from the Mayor.

After becoming Chief, Hoopes formed a vice squad headed by Detective Theodore Pokoy, with Officers Wyatt and Worrilow serving with him on the three-man squad. This squad arrested four Miller-Fontaine numbers writers in a period of a few months. In July 1977, Miller and Fontaine met with the Mayor; the Mayor agreed that the $2,000 per month payments could be stopped temporarily because he could not control Hoopes and the vice squad.

In November 1977, Miller and Fontaine paid the Mayor a total of $1,900, $1,500 of which was delivered by Fontaine to the Mayor on November 1, and the remaining $400 was delivered by Fontaine to the Mayor on November 4. In December 1977, Miller and Fontaine were informed by the government that Detective Pokoy had been

---

**3.** *See United States v. Nacrelli,* 468 F.Supp. 241 (E.D.Pa.1979).

1042

working with the FBI, that their conversations with Pokoy were taped and that they would be indicted on racketeering charges. Miller and Fontaine agreed to cooperate with the FBI.

On January 11, 1978, Frank Miller agreed to wear a body recorder during a conversation with the defendant, Feliziani. The FBI equipped Miller with the recorder and kept him under surveillance during the conversation. They were able to observe the conversation through the window of the defendant's store. At the FBI's suggestion, Miller asked the defendant to check with the Mayor to see whether money that Miller was giving Fontaine to be delivered to the Mayor was actually received by him. The defendant agreed to speak with the Mayor about it. Miller and the defendant also discussed Miller's chief opposition, Leroy Miah. Miller told the defendant that he wanted a meeting with the Mayor; the defendant agreed to try to arrange a meeting.

The following day, January 12, 1978, Miller again met with the defendant in his store. The conversation was again recorded, under FBI surveillance. The defendant reported that he had seen the Mayor and asked if he had received money from Miller. According to the defendant, the Mayor said that he had asked Miller for money at election time, but had not received any money from Miller since then. The defendant told Miller that the Mayor had said that ". . . he's (the Mayor) got nothing to do with nothing now because that's the worst thing to get back involved that strong." The defendant told Miller that he had conveyed Miller's request for a meeting with the Mayor and the Mayor said he would try to work something out.

The government's case was strong, and there can be no doubt that the evidence was sufficient to support the jury's verdict as to each of the two counts of the indictment, upon which the defendant was convicted. The evidence amply supports a finding that the defendant conspired to participate in the conduct of the affairs of the Chester Police Department through a pattern of racketeering activity and that he conspired to obstruct the enforcement of state and local laws with the intent to facilitate the illegal gambling business of Miller and Fontaine. We, therefore, reject the defendant's contention that the evidence produced at trial was insufficient to support the verdict of the jury.

III. *MOTION FOR A NEW TRIAL.*

The defendant makes the following twenty-eight separate allegations of error in support of his motion for a new trial:

1. The Court erred by denying the defendant's pretrial motion to dismiss the indictment on the grounds of excessive pretrial publicity.

2. The Court erred by denying defendant's pretrial motion for discovery.

3. The Court erred by denying the defendant's pretrial motion for bill of particulars.

4. The Court erred by denying the defendant's pretrial motion to suppress electronically obtained conversations.

5. The Court erred in granting the government's motion to use electronically obtained conversations at the trial, including a Starks' motion.

6. The Court erred in concluding that the voir dire process has resulted in the obtaining of a jury free of the taint of improper pretrial publicity.

7. The Court erred in failing to fix for this trial an order of proof requiring the government before introducing into evidence out-of-court declarations of alleged co-conspirators to first establish by a fair preponderance of the evidence that (a) the conspiracy existed, (b) the declarant and the defendant were members thereof, and (c) the declarations were made in the course of, and in furtherance of, the conspiracy.

8. The Court erred in allowing hearsay testimony under the guise of a "state of mind" exception to the hearsay rule, as to Government witnesses Hoopes and Pokoy.

9. The Court erred in allowing Government witness Hoopes to testify as to the "state of mind" of others in the Police Department of the City of Chester.

10. The Court erred in allowing Government witness Hoopes to testify as to matters that time-wise extended far beyond the scope of the alleged conspiracy in the indictment, all to the prejudice of the defendant.

11. The Court erred in allowing Government witness Hoopes to testify as to conversations between Pokoy and Frank Miller, an alleged co-conspirator, as these were clearly hearsay, and were uttered only for the purpose of prejudicing the defendant.

12. The Court erred in allowing Government witness Hoopes to testify as to conversations between Hoopes and Mayor Nacrelli, an alleged co-conspirator, which clearly were hearsay as to the defendant, were clearly not statements made by a co-conspirator *in furtherance of the conspiracy*, and which were prejudicial to the defendant.

13. The Court erred in allowing testimony to be given by Government witness Pokoy and by allowing tape recordings to be played of conversations between Pokoy and Fontaine and Miller as such were beyond the scope of any alleged conspiracy of which the defendant was a part. Such conversations and tapes were evidence of a separate conspiracy not involving the defendant and were prejudicial to the defendant.

14. The Court erred in allowing Government witness Fontaine to testify as to alleged conversations with Joe Eyre in 1968–1969 as such conversations were beyond the scope of the conspiracy alleged in the indictment, were evidence, if believed, of a separate conspiracy not involving the defendant, and were prejudicial to the defendant.

15. The Court erred in allowing the Government to play the tapes of Mayor Nacrelli and Herman Fontaine of December 23, 1977 and January 10, 1978 respectively, because the tapes were beyond the scope of the conspiracy alleged in the indictment, were made by Fontaine as an agent of the Government and were not made in furtherance of the conspiracy alleged in the indictment, and were prejudicial to the defendant.

16. The Court erred in allowing Government witness Fontaine to testify as to conversations with Government witness Pokoy because such conversations were not evidence of the conspiracy alleged in the indictment, but evidence of a separate conspiracy, not involving the defendant, and were prejudicial to the defendant.

17. The Court erred in allowing Government witness Fontaine to testify as to alleged conversations with Mayor Nacrelli about alleged conversations between Mayor Nacrelli and the defendant without reference to any time period, there being no proof that the alleged conversations were made within the time period alleged in the indictment or were made in furtherance of the conspiracy alleged in the indictment.

18. The Court erred in allowing the Government witness Fontaine to comment about the tapes of Miller and the defendant and to make self-serving statements and to answer non-responsively, injecting prejudicial statements against the defendant, all to the prejudice of the defendant.

19. The Court erred in allowing Government witness Miller to testify as to alleged meetings and conversations with Joe Eyre in 1968–1969 and such testimony was clearly hearsay, was beyond the scope of any conspiracy alleged in the indictment, and, if anything, was evidence of a separate conspiracy not alleged in the indictment and not involving the defendant, all to the prejudice of the defendant.

20. The Court erred in allowing the Government to play the tapes of conversations between Government witness Miller and the defendant on January 11, 1978, and January 12, 1978, and in allowing Miller to testify as to what he "thought" the defendant meant as to things said during the conversations. Such tapes were recorded at a time beyond the dates of the conspiracy alleged in the indictment, were not statements made or a conversation held in furtherance of the conspiracy alleged in the indictment, and were prejudicial and should have been excluded.

21. The Court erred in allowing the Government to call United States Attorney

Magarity as a witness and in allowing Magarity to attempt to testify and testify beyond the scope directed by the Court.

22. The Court erred in allowing the Government to present alleged evidence against Mayor Nacrelli as being evidence against the defendant without any showing that the defendant was involved either directly or indirectly, and without any showing that the defendant knew or had any reason to know of the alleged activity attributed to Mayor Nacrelli.

23. The Court erred in finding and ruling that the Government has proved by *independent evidence*, apart from statements of alleged co-conspirators, that a conspiracy existed and that the defendant was part of that conspiracy. No such independent evidence was produced by the Government.

24. The Court erred in finding and ruling that one single conspiracy existed from 1968 through 1978 and that Joseph Eyre, Mayor Nacrelli, Herman Fontaine, Frank Miller and the defendant were all co-conspirators and members of that conspiracy.

25. The Court erred in denying defendant's requested points for charge in the form requested.

26. The Court erred in granting those points for charge of the Government to which the defendant objected.

27. The Court erred in charging "aiding and abetting" as to Count I and allowing the Government to argue the concept of "aiding and abetting", in that such charge and argument were confusing and such confusion affected the understanding of Count II and Count III, and both the argument and the charge were prejudicial to the defendant.

28. Defendant respectfully prays that your Honorable Court will grant sufficient time within which to amend, supplement, or otherwise particularize, by reference to the Notes of Testimony, the issues which are to be raised in post-trial motions in this matter, providing to the defendant a reasonable time following the receipt of the Notes of Testimony of the trial for this purpose.

## 1, 6. *Pretrial Publicity.*

The defendant's first and sixth allegations of error concern pretrial publicity. He contends that the Court erred in denying his motion to dismiss the indictment because of pretrial publicity. Before the defendant's case was severed from the second trial of Mayor Nacrelli, the Court heard oral argument on the motion to dismiss the indictment.[4] After the severance, and prior to the defendant's second trial, the defendant did not again raise issues of pretrial publicity. After lengthy individual voir dire, where liberal challenges for cause were granted, the Court found that a fair and impartial jury had been selected. The defendant now contends that because of exposure to pretrial publicity, the jury selected was not fair and impartial. The exposure of jurors to pretrial publicity does not compel their disqualification. *United States v. Radetsky*, 535 F.2d 556 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976). The prospective jurors here were questioned as to their ability to judge the case solely on the evidence to be heard in court; those who expressed any reservation were excused. Thus, we find that our rulings on defendant's motions concerning pretrial publicity were without error.

## 2, 3. *Discovery and Bill of Particulars.*

The defendant in his second and third allegations of error contends that the Court erred in denying his motions for a bill of particulars and for discovery. The purpose of a bill of particulars is to " 'inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense'." *United States v. Addonizio*, 451 F.2d 49, 63–64 (3d Cir. 1972) (quoting *Unit-*

---

4. The Court also granted a motion for continuance and considered a motion for change of venue in connection with pretrial publicity, but the defendant does not address these issues here.

ed States v. Tucker, 262 F.Supp. 305, 308 (S.D.N.Y.1966) ). The granting of a bill of particulars is addressed to the sound discretion of the trial court. *United States v. Armocida*, 515 F.2d 49, 54 (3d Cir. 1975). A bill of particulars is required only where the indictment is too vague and indefinite to accomplish these objectives. *United States v. Smith*, 405 F.Supp. 144, 146 (E.D.Pa. 1975). A bill of particulars is not to be used as a discovery tool by the defendant. *Addonizio*, 451 F.2d at 64. The defendant here submitted a nine-page list of requested particulars. We denied this request, finding that the indictment itself provided the defendant with such clear and definite information as to make a bill of particulars unnecessary. The indictment was drawn in sufficient detail to advise the defendant of the charges against him and to protect him from a second prosecution for the same offenses.

■ The government produced all discovery required by Rule 16. In addition, it provided all tape recordings to the defendant for review prior to trial. All other requests were properly denied, as they related to information clearly not discoverable, such as statements of persons whom the government did not intend to call as witnesses at trial, defendant's oral statements to persons whom he did not know were government agents, and lists of the names and addresses of all government witnesses.

Thus, we find that our pretrial rulings in connection with the bill of particulars and discovery were proper.

*4, 5. Use of Taped Conversations.*

The defendant in his fourth and fifth allegations of error contends that the Court erred in granting the government's "Starks" motion to introduce electronically monitored conversations, while denying the defendant's motion to suppress them. *United States v. Starks*, 515 F.2d 112, 121 n. 11 (3d Cir. 1975) requires the Government to establish the following before a tape recording can be admitted into evidence:

(1) That the recording device was capable of taking the conversation now offered in evidence.

(2) That the operator of the device was competent to operate the device.

(3) That the recording is authentic and correct.

(4) That changes, additions or deletions have not been made in the recording.

(5) That the recording had been preserved in a manner that is shown to the court.

(6) That the speakers are identified.

(7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement.

■ The defendant stipulated to all of these requirements except that the conversations were made voluntarily and in good faith. Having heard testimony from witnesses (Herman Fontaine and Frank Miller) who wore body recorders and/or permitted taping of their telephone conversations, the Court determined that their participation was voluntary. The test is whether consent to the recording is voluntarily given; consent is not rendered involuntary merely because the person who consents expects some benefit therefrom. *United States v. Moskow*, 588 F.2d 882 at 891 (3d Cir. 1978). Therefore, the fact that Miller and Fontaine were cooperating with the government in the hope of receiving favorable treatment for themselves does not render their consent involuntary, and we find that our pretrial ruling was without error.

*7, 10, 11, 12, 13, 14, 16, 17, 19, 23, 24. Hearsay Declarations: The Co-Conspirator Rule.*

The defendant contends that it was error for the Court to admit out-of-court declarations of co-conspirators against the defendant. He argues that there was no independent evidence from which the Court could have found that the defendant was a member of the single conspiracy charged in the indictment. He further argues that the Court should have imposed an order of proof on the government, requiring them first to establish the existence of the conspiracy and that defendant was a member

thereof before introducing the co-conspirator's statements.

■ Hearsay declarations of co-conspirators are admissible against other members of the conspiracy only upon a sufficient showing, by independent evidence, that the conspiracy existed, that defendant and declarant were members thereof, and that the declarations were made in furtherance of the conspiracy. *United States v. Nixon,* 418 U.S. 683, 701, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

It has long been the rule in the Third Circuit that the judge must find by "a fair preponderance of the evidence" that the conspiracy existed, that the defendant was a member thereof, and that the declarations were made during the conspiracy and in furtherance thereof. *United States v. Bey,* 437 F.2d 188 (1971). This rule was not changed by the *Nixon* case. The Third Circuit in the *Trotter* case said:

> We need not determine whether the standard referred to in *United States v. Nixon, supra,* has more to commend it than the "fair preponderance" standard applied in this circuit. Since the "fair preponderance" standard is more severe than the prima facie standard, admission of hearsay under the former would *a fortiori* satisfy the latter. In the instant case, the application of the fair preponderance standard placed a greater burden on the prosecution than it would have borne under the prima facie standard alternatively urged by defendant Trotter. *United States v. Trotter,* 529 F.2d 806 (3d Cir. 1976).

In determining whether there is a preponderance of the evidence, the credibility of the evidence must be weighed. *Bey,* 437 F.2d at 191.

■ The Court found ample credible evidence, independent of declarations of co-conspirators, that the conspiracy existed,

that defendant was a member thereof, and that each declaration introduced in evidence was made during the conspiracy in furtherance thereof. Furthermore, the Court, in making this finding, outside the presence of the jury, advised the defendant that he could renew his motion to strike the hearsay declarations of co-conspirators at any time he believed the credibility of the independent evidence supporting this finding had been destroyed.

The defendant contends that it was error for the Court to find that there was sufficient independent evidence of the *single* conspiracy charged in the indictment, arguing that the evidence showed, if anything, multiple unconnected conspiracies. The Court found ample evidence of a single conspiracy in connection with its determination by a preponderance of the evidence that there was sufficient independent evidence of the conspiracy charged.[5] This conspiracy began during Joseph Eyre's tenure as Republican City Chairman, and continued throughout Mayor Nacrelli's term in office. The defendant, Feliziani, joined the conspiracy with full knowledge of its continuing purpose—the bribery of city officials for the purpose of protecting the Miller and Fontaine racketeering operation from arrests by the Chester police.

■ As to the defendant's contention that the Court should have imposed an order of proof on the government, this is a matter totally within the Court's discretion. *United States v. McCormick,* 565 F.2d 286, 289 (4th Cir. 1977); *United States v. Testa,* 548 F.2d 847, 852–53 (9th Cir. 1977); *United States v. Harris,* 542 F.2d 1283, 1299–1300 (7th Cir. 1976). We find no error in our refusal to impose an order of proof in the second trial, after having done so in the first trial.

---

5. We have reviewed the sufficiency of the evidence in connection with the defendant's motion for judgment of acquittal, finding the evidence to be sufficient for the jury to have found beyond a reasonable doubt that the defendant was a member of the single conspiracy charged in the indictment. The jury was instructed that they must acquit the defendant if they found that the evidence showed that there was some conspiracy or conspiracies other than that charged in the indictment. *See Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Boyd,* 595 F.2d 120 (3d Cir. 1978, en banc).

### 20. Miller-Feliziani Tapes.

█ The defendant contends that the Court erred in permitting the government to play tapes of conversations between Frank Miller and the defendant which were recorded on January 11 and 12, 1978. It is the defendant's contention that these conversations were inadmissible because they were statements of a co-conspirator which were not made during the course of the conspiracy nor in furtherance thereof. The co-conspiratory exception to the hearsay rule is not applicable to the defendant's statements which were admissions, excluded from the definition of hearsay by Rule 801(d)(2)(A) of the Federal Rules of Evidence. We therefore find no error in admitting the Miller-Feliziani recordings.

### 15. Nacrelli-Fontaine Tapes.

The defendant, in his fifteenth allegation of error, claims that the Court erred in permitting the government to play tapes of conversations between Mayor Nacrelli and Herman Fontaine which were recorded on December 23, 1977 and January 10, 1978. He contends that these tapes do not come within the co-conspirator exception to the hearsay rule because they were made after December 20, 1977, and because Herman Fontaine was cooperating with the government and was no longer a member of the conspiracy.

█ Although the indictment alleges that the conspiracy continued from "on or about April 1, 1974 to on or about December 20, 1977", the conversations recorded on December 23, 1977 and January 10, 1978 were clearly statements made during the course of the conspiracy and in furtherance thereof. These tapes were also evidence that monies were paid to the Mayor on these dates. Though Fontaine was cooperating with the government, there were at least two active members of the conspiracy at the times the tapes were made, i. e., Mayor Nacrelli and the defendant.

█ The conspiracy was, therefore, in existence at least until January 10, 1978, and, on this basis, we ruled at trial that the taped conversations were admissible as declarations of a conspirator made during the course of the conspiracy and in furtherance thereof. The fact that the indictment alleged that the conspiracy continued until "on or about December 20, 1977", whereas the evidence presented at trial showed clearly that it continued until at least January 10, 1978 was not a prejudicial variance. As the Ninth Circuit stated in *United States v. Anderson,* 532 F.2d 1218, 1230 (9th Cir.), *cert. denied,* 429 U.S. 839, 97 S.Ct. 111, 50 L.Ed.2d 107 (1976), "There was no fatal variance as to the times of the existence of the conspiracy as the indictment charged in terms of 'on or about' . . ."[6] A time variance is prejudicial per se only where time is an element of the crime itself. *United States v. Somers,* 496 F.2d 723, 745 (3d Cir. 1974) (time discrepancy greater than one year). Time is not an essential element of the conspiracies of which the defendant was convicted in Counts II and III. Furthermore, the defendant was not prejudiced by the admission of the conversations taped on December 23, 1977 and January 10, 1978, in that there is no danger of double jeopardy, and the tapes were no surprise to the defendant. He was well aware of the existence of such tapes prior to his appearance before the grand jury and prior to trial. Accordingly, we find no error in the admission at trial of the Fontaine-Nacrelli tapes.[7]

### 8, 9. Hearsay Declarations: State of Mind.

The defendant, in his eighth and ninth allegations of error, contends that it was

---

**6.** When the phrase "on or about" is used in an indictment, courts have held that there is no variance when the proof at trial is within weeks of the "on or about" date charged in the indictment. *United States v. Antonelli,* 439 F.2d 1068 (1st Cir. 1971); *Kokotan v. United States,* 402 F.2d 1134 (10th Cir. 1969).

**7.** Furthermore, insofar as the tapes are evidence that payments were made to the Mayor, they are evidence of *acts* of the conspiracy, and as such, the evidence is admissible without reference to the co-conspirator exception to the hearsay rule. *Anderson v. United States,* 417 U.S. 211, 219, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974).

error for the Court to admit testimony of certain government witnesses on the basis of the state of mind exception to the hearsay rule. The defendant refers here to the testimony of witnesses who were members of the Chester Police Department who testified that they did not arrest Miller-Fontaine numbers writers because they feared the loss of their jobs or other punishment if they made such arrests. They gave as their reasons for so fearing a general understanding among police officers that Miller and Fontaine paid officials for protection and that any officer arresting their writers would be punished. They also testified that they had observed other officers receive punishment for making such arrests.

 Under Federal Rule of Evidence 801(c), hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The witnesses' declarations at trial that they feared arresting Miller-Fontaine numbers writers are obviously not hearsay, since they were the witnesses' statements concerning their own state of mind at a particular time.[8] These same witnesses testified that the basis for their fear was two-fold: (1) their personal knowledge that certain officers had been punished for arresting members of the Miller-Fontaine gambling operation; and (2) that they had been told early in their careers as police officers by veterans on the force that Miller and Fontaine paid for police protection and any officer arresting a member of their operation would be punished. The testimony as to what other officers had told them is likewise not within the definition of hearsay, since the declarations of the other officers were admitted, not for the truth of the matter asserted, but to show the effect on the officers who testified.[9] *See* McCormick, *Evidence,* 2d ed., 1978, at 589; 4 Weinstein,

*Evidence,* ¶ 801(c)(01) at 801–62–63. The inaction of police officers, or their fear to take action, with respect to the Miller-Fontaine gambling operation, were directly relevant to the issue on trial, i.e., whether the racketeering operation of Miller and Fontaine was being protected by the Chester police as a result of payments to the Mayor, some of which were delivered by the defendant, Feliziani. We therefore find no error in the admission of such evidence at trial.

*22, 27. Aiding and Abetting.*

The defendant, in his twenty-second and twenty-seventh allegations of error, contends that, since aiding and abetting was not specifically alleged in the indictment, it was error for the Court to instruct the jury as to aiding and abetting in connection with Count I. Although the defendant was acquitted as to Count I, he contends that this charge confused the jury in their consideration of Counts II and III.

 It is not necessary that an indictment specifically charge aiding and abetting to support a conviction for aiding and abetting. Each count of the indictment must be read as if 18 U.S.C. § 2 were included therein. *United States v. Forsythe,* 560 F.2d 1127, 1136 n. 15 (3d Cir. 1977). It was not error to instruct the jury that the defendant was charged with aiding and abetting Mayor Nacrelli in the Count I racketeering offense, since the factual allegations of the indictment charged that defendant assisted the Mayor in racketeering acts of bribery by carrying bribery payments to him from Miller and Fontaine. Furthermore, it was not error to permit evidence as to Mayor Nacrelli's participation in racketeering activity since, before a defendant may be convicted of aiding and abetting, it must first be established that someone committed the principal offense.

---

**8.** In any event, should such statements be considered hearsay, they would fall within the "declarants's then existing state of mind." Rule of Evidence 803(3).

**9.** An alternative basis for the admissibility of the testimony as to what other officers told the

witnesses, if such testimony is considered to be hearsay, is the state of mind exception, Rule 803(3). Such testimony reflects the state of mind of the declarant officers, who did not testify at trial.

*Monsen v. Consolidated Dressed Beef Co., Inc.,* 579 F.2d 793, 799 (3d Cir. 1978).

 The defendant argues that the jury was confused in their consideration of Counts II and III because of the Count I instruction. The jury was instructed to consider each count separately; the questions they asked for clarification as to each count clearly indicated that they did so. Furthermore, jury confusion may not be inferred from the mere fact that they convicted the defendant of two counts of conspiracy while acquitting him of aiding and abetting. *See United States v. Krogstad,* 576 F.2d 22 (3d Cir. 1978). We therefore find no error in our rulings at trial.

*21. Testimony of Assistant United States Attorney Magarity.*

 The defendant, in his twenty-first allegation of error, contends that the Court erred in permitting Assistant United States Attorney Gregory Magarity to testify about the defendant's conduct prior to and during his grand jury testimony. The defendant, testifying in his own defense, said that Magarity had threatened him in connection with his testimony before the grand jury. It was therefore proper to permit Magarity to testify in rebuttal on the issue of the voluntariness of the defendant's grand jury testimony. We find no error in our ruling at trial.

*25. Points for Charge.*

The defendant, in his twenty-fifth allegation of error, contends that the Court erred in denying his requested points for charge. In fact, each and every one of defendant's requested points for charge was adopted and incorporated into the Court's charge to the jury.

*Other Alleged Errors.*

While we have not herein discussed all the other contentions of alleged error raised by the defendant, we have considered each and every allegation of error and hold that none of them, singly or collectively, is of sufficient substance to merit any further discussion as a basis for granting a new trial in this case.

*Conclusion.*

Accordingly, an Order will be entered denying the defendant's motions for arrest of judgment, judgment of acquittal, and a new trial.