

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-26-1997

# United States v. Williams

Precedential or Non-Precedential:

Docket
96-3629,96-3661

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"United States v. Williams" (1997). *1997 Decisions.* Paper 208.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/208

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 26, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 96-3629, 96-3661,
and 96-3666

UNITED STATES OF AMERICA

v.

SALVATORE A. WILLIAMS,
a/k/a "Sonny"

SALVATORE A. WILLIAMS,
Appellant No. 96-3629

UNITED STATES OF AMERICA

v.

SALVATORE C. WILLIAMS,
a/k/a "Sal"

SALVATORE C. WILLIAMS,
Appellant No. 96-3661

UNITED STATES OF AMERICA

v.

ADOLPH WILLIAMS,
a/k/a "Junior"

Adolph Williams,
Appellant No. 96-3666

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

(Criminal Action Nos. 95-00092-4, 95-00092-1,
95-00092-2)

Argued June 16, 1997

Before: COWEN, ALITO, and SEITZ, Circuit Judges

(Opinion Filed: August 26, 1997)

Frederick W. Thieman
United States Attorney
Paul J. Brysh (Argued)
Office of United States Attorney
633 United States Post Office
 & Courthouse
Pittsburgh, PA 15219

Attorneys for Appellee

Bruce A. Antkowiak (Argued)
31 North Main Street
Greensburg, PA 15601

Attorney for Salvatore A. Williams

J. Alan Johnson (Argued)
Swensen, Perer & Johnson
Two PNC Plaza
Suite 2710
Pittsburgh, PA 15222

Attorney for Salvatore C. Williams
and Adolf Williams

Thomas A. Livingston
Plunkett & Cooney
600 Grant Street
Suite 3000
Pittsburgh, PA 15219

Attorney for Salvatore C. Williams

2

OPINION OF THE COURT

ALITO, Circuit Judge:

Salvatore A. Williams, Salvatore C. Williams, and Adolph Williams (the "defendants") entered conditional pleas of guilty to offenses related to the operation of an illegal gambling business. On appeal, they contest the district court's denial of pretrial motions, including motions to suppress the evidence derived from electronic oral and video surveillance1 and evidence obtained in a search of Adolph Williams's home. We affirm.

I.

The illegal gambling operation that resulted in the

defendants' convictions began in the 1960's. In initially investigating the operation, the Pennsylvania State Police utilized a confidential informant and conducted physical surveillance of an office located at 1420 Fifth Avenue, Pittsburgh (the "Fifth Avenue premises") that was believed to serve as the operation's headquarters. Concluding that these investigative techniques were insufficient, the District Attorney of Allegheny County filed applications in the Superior Court of Pennsylvania under the state Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. Ann. SS 5701-26, seeking authorization for the state police to conduct electronic oral and video surveillance of two rooms of those premises. The applications were supported by an affidavit of two Pennsylvania State Troopers who explained some of the evidence already gathered by other means and the basis for their belief that electronic oral and video surveillance were necessary. Some of the information contained in the affidavit was provided by the confidential informant who had worked within the organization for

_____

1. We use the phrase "electronic oral surveillance" as shorthand for the interception of wire, electronic, or oral communications within the meaning of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. SS 2510-20, and the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. Ann. SS 5701-26.

seven years. The affidavit further stated that the state police were conducting the investigation in conjunction with the Federal Bureau of Investigation. A. 50-124. 2

On June 26, 1991, Judge Justin M. Johnson of the Superior Court signed an order authorizing electronic oral surveillance of the Fifth Avenue premises for a period of 30 days. He denied the request for video surveillance authorization, believing that the state wiretapping statute did not empower a Superior Court judge to authorize video surveillance, but he provided that his orders were "entered without prejudice to the applicant seeking further additional relief in the appropriate Court of Common Pleas."3 A. 18(d). Accordingly, the next day, the District Attorney filed an application for video surveillance in the Court of Common Pleas of Allegheny County. This application was supported by the same affidavit as the application for electronic oral surveillance previously filed in the Superior Court. Court of Common Pleas Judge Robert Dauer granted the application and authorized video surveillance of the same two rooms for a period of 30 days. After 30 days passed, the District Attorney requested and received extensions for both orders from the respective courts. All

electronic oral and video surveillance of the Fifth Avenue premises ended on Friday, August 9, 1991. On Monday morning, August 12, 1991, the tapes of the surveillance were sealed.

In May 1993, the United States Attorney for the Western District of Pennsylvania applied to a federal magistrate judge for a search warrant for the residence of Adolph Williams at 274 Foxcroft Road, Pittsburgh (the "Foxcroft Road residence"). The application was supported by an

_____

2. "A." denotes the one-volume Appendix submitted by Salvatore A. Williams.

3. Under the state wiretapping statute, an application for authorization to conduct electronic audio surveillance must be made to a judge of the Superior Court, see 18 Pa. Cons. Stat. Ann.S 5708. Judge Johnson apparently concluded that his authority under the state wiretapping statute did not extend to video surveillance and that an application to conduct such surveillance should therefore be made to a judge of the Court of Common Pleas, the state trial-level court.

4

affidavit executed jointly by a Special Agent of the FBI and a Pennsylvania State Trooper who were involved in the investigation. The affidavit stated that physical surveillance had revealed that an individual associated with the operation took betting slips twice daily from a location on Fifth Avenue, Pittsburgh, to the Foxcroft Road residence. The affidavit related that in an intercepted comment Adolph Williams had said that he would take the gambling proceeds to his home for safekeeping, and the affidavit added that the confidential informant had learned that Adolph Williams had a hiding place in his residence that was used for storing records. On May 25, 1993, the magistrate judge issued the search warrant. The search was conducted on that day and resulted in the seizure of currency, gambling records, and other evidence.

The office of the United States Attorney for the Western District of Pennsylvania presented the case to a federal grand jury, and some of the electronically intercepted evidence was disclosed to the grand jury, even though no court order specifically authorizing such disclosure had been obtained. Some of this same evidence was also disclosed to agents with the Criminal Investigation Division of the Internal Revenue Service. A. 317.

The grand jury returned a 27-count indictment, charging conspiracy and various gambling and income tax offenses.

The defendants moved to suppress much of the evidence intercepted through the electronic oral and video surveillance, as well as the evidence seized from the search of the Foxcroft Road residence. The district court initially suppressed evidence derived from the oral and video surveillance on the ground that it exceeded the periods authorized by the state court judges. The government appealed, and we reversed in an unpublished opinion, holding that the district court had misinterpreted the state court orders. United States v. Williams, No. 95-3529 (3d Cir. May 20, 1996). On remand, the defendants all entered conditional guilty pleas that preserved for appeal the district court's denial of their other pretrial motions.

Salvatore A. Williams pleaded guilty to one count of violating 18 U.S.C. S 371 by conspiring to conduct an illegal gambling business in contravention of 18 U.S.C.S 1955(a).

5

He was sentenced to one month of imprisonment and two years of probation. Salvatore C. Williams and Adolph Williams pleaded guilty to conducting an illegal gambling business, in violation of 18 U.S.C. SS 1955 and 2, and to one count of violating 18 U.S.C. S 371 by conspiring to defraud the United States of wagering tax revenue. They were sentenced to 15-month terms of imprisonment and three-year terms of supervised release, and they were fined $40,000 and $4,000, respectively. The defendants then took this appeal.

On appeal, the defendants contend (1) that the district court erred in refusing to suppress the video surveillance evidence because that surveillance was conducted in violation of the Fourth Amendment; (2) that the evidence seized from Adolph Williams's home should have been suppressed because the warrant was not supported by probable cause; (3) that the charges under 18 U.S.C.S 1955 should have been dismissed because those charges were based on violations of Pennsylvania gambling statutes that violate the Equal Protection Clause; (4) that the district court erred in refusing to suppress the electronically intercepted oral evidence because the Pennsylvania wiretapping statute does not comply with the certain requirements of Title III of the federal Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.SS 2510-2520 ("Title III"); (5) that the district court erred in refusing to suppress the electronically intercepted oral evidence because it was disclosed in violation of 18 Pa. Cons. Stat. Ann. SS 5718 and 5717(a); (6) that the district court erred in refusing to suppress the electronically intercepted oral evidence because there was no necessity for the use of this

investigative technique, as is required by 18 Pa. Cons. Stat. Ann. S 5709(3)(vii) and 18 U.S.C. S 2518(1)(c); (7) that the extension of the period of electronic surveillance was unjustified and that the evidence obtained as a result should have been suppressed; and (8) that the district court erred in refusing to suppress the electronically intercepted oral evidence because the tapes were not timely sealed as required by Title III and the state wiretapping statute.4

_____

4. The first four arguments are raised in the joint brief submitted on behalf of Salvatore C. Williams and Adolph Williams; citations to "Jt. Br."

6

II.

We turn first to the defendants' argument that the video surveillance of the Fifth Avenue premises violated the Fourth Amendment and that the evidence resulting from this surveillance should have been suppressed. The defendants do not contend that either Title III or the Pennsylvania wiretapping statute authorizes or prohibits video surveillance. Instead, they base their arguments on the understanding of the governing legal principles set out in United States v. Torres, 751 F.2d 875 (7th Cir. 1984). In Torres, the Seventh Circuit held, among other things, that Title III has no application to video surveillance, id. at 880-82; that a federal district court has the authority, either under Federal Rule of Criminal Procedure 41 or by virtue of its inherent powers, to issue a warrant for video surveillance, id. at 877-80; that video surveillance is a search governed by the Fourth Amendment, id. at 882; and that if the government conducts video surveillance in conformity with certain requirements of Title III, including the requirement of judicial certification that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. S 2518(3)(c), then the government has also conformed to the related requirements contained in the Fourth Amendment's warrant clause, 751 F.2d at 882.5 No party in this appeal contests any of these principles, and therefore we will assume their validity for present purposes.

_____

refer to that joint brief. The final four arguments are raised in the brief
filed on behalf of Salvatore A. Williams; citations to "SAW Br." refer to his

brief. Each brief incorporates by reference the arguments raised in the other.

5. Other courts of appeals have taken a similar approach. See United States v. Falls, 34 F.3d 674, 680 (8th Cir. 1994); United States v. Mesa-Rincon, 911 F.2d 1433, 1437 (10th Cir. 1990); see also United States v. Koyomejian, 970 F.2d 536, 542 (9th Cir.), cert. denied, 506 U.S. 1005 (1992); United States v. Cuevas-Sanchez, 821 F.2d 248, 252 (5th Cir. 1987); United States v. Biasucci, 786 F.2d 504, 510 (2d Cir.), cert. denied, 479 U.S. 827 (1986).

A. The defendants contend that the video surveillance in this case was "unreasonable" within the meaning of the Fourth Amendment because the nature of the crimes under investigation did not justify the use of such an intrusive investigative technique. In making this argument, the defendants rely on certain statements in Torres . While upholding the video surveillance in that case, which targeted "safe houses" in which it was believed that a terrorist group was assembling bombs, the Torres court wrote:

> The usual way in which judges interpreting the Fourth Amendment take account of the fact that searches vary in the degree to which they invade personal privacy is by requiring a higher degree of probable cause (to believe that the search will yield incriminating evidence), and by being more insistent that a warrant be obtained if at all feasible, the more intrusive the search is. But maybe in dealing with so intrusive a technique as television surveillance, other methods of control as well, such as banning the technique outright from use in the home in connection with minor crimes, will be required, in order to strike a proper balance between public safety and personal privacy. That question is not before us, but we mention it to make clear that in declining to hold television surveillance unconstitutional per se we do not suggest that the Constitution must be interpreted to allow it to be used as generally as less intrusive techniques can be used.

751 F.2d at 882-83 (emphasis added) (citations omitted).

Relying on these remarks, the defendants maintain that their offenses were not sufficiently serious to justify video surveillance. However, the video surveillance in this case was not conducted in a "home," and the order authorizing the video surveillance was based on a finding that the defendants had committed, were committing, and would continue to commit first-degree felonies, which are

punishable by imprisonment for up to 20 years.6 Thus,

_____

6. The video surveillance authorization order referred to violations of 18
Pa. Cons. Stat. Ann. S 911 (which pertains to"corrupt organizations" and

8

even the equivocal and limited Torres dicta does not
support reversal.

We note that every court of appeals that has addressed
video surveillance has held that video surveillance
conforming to the standards set out in Title III is
constitutional, and we have found no case that suggests
that the application of these standards depends upon the
nature of the crime or crimes under investigation. Title III
standards were applied in every case, covering a range of
crimes from counterfeiting to drug distribution to
loansharking. E.g., Falls, 34 F.3d 674 (conspiracy to
distribute cocaine, distribution of cocaine, and related
charges); Koyomejian, 970 F.2d 536 (money laundering);
Mesa-Rincon, 911 F.2d 1433 (counterfeiting); Cuevas-
Sanchez, 821 F.2d 248 (possession of marijuana with intent
to distribute); Biasucci, 786 F.2d 504 (loansharking). For
these reasons alone, we reject the defendants' argument
here.

Moreover, we are skeptical of the defendants' general
suggestion that a judicial officer, in deciding whether to
issue a search warrant or in reviewing the issuance of a
search warrant, should take into account his or her own
evaluation of the seriousness of the felony or felonies under
investigation. Other than the Torres dicta, the defendants
cite no authority that provides any support for this
proposition. In considering the reasonableness of a search
or seizure, it is sometimes appropriate for a court to
balance "the public interest and the individuals's right to
personal security free from arbitrary interference by law
officers." United States v. Brignoni-Ponce , 422 U.S. 873, 878
(1975); see also Maryland v. Wilson, 117 S. Ct. 882, 885
(1997). But it does not follow that a judicial officer, in
weighing the public interest, may properly take into
account his or her personal opinion regarding the need for

_____

is a first-degree felony) and a conspiracy to commit that offense (and
others), 18 Pa. Cons. Stat. Ann. S 903, which is also a first-degree
felony.
See 18 Pa. Cons. Stat. Ann. S 905(a). Afirst-degree felony is punishable
by imprisonment for not more than 20 years. 18 Pa. Cons. Stat. Ann.
S 1103(1). The order also referred to one misdemeanor, a violation of 18

Pa. Cons. Stat. Ann. S 5512, which concerns illegal lotteries.

or the importance of the criminal provisions that appear to have been violated. Like other citizens, judicial officers differ in their views regarding the seriousness of certain criminal offenses. If judicial officers were permitted to take their personal opinions on these matters into account in deciding whether a particular search was reasonable, the meaning of reasonableness under the Fourth Amendment would vary significantly depending on the particular judicial officer before whom the question was presented.

The defendants here characterize their gambling offenses as relatively benign, and there are undoubtedly those who would agree with this characterization. But that view of illegal gambling is not universal. In enacting Title III, Congress thought that gambling offenses were sufficiently serious to include them among the crimes in the investigation of which it is permissible to employ wiretapping and bugging, investigative techniques that result in a serious invasion of personal privacy. See 18 U.S.C. S 2516(1)(c) (permitting federal wiretapping or bugging to investigate illegal transmission of wagering information and operation of gambling enterprises); and id. S 2516(2) (permitting state wiretapping and bugging to investigate gambling offenses). Congress also has made it a felony, punishable by up to five years' imprisonment, to conduct, finance, manage, supervise, direct, or own all or part of an illegal gambling business. 18 U.S.C.S 1955. And Congress has designated violations of this provision as predicate offenses under the money laundering statute, id. S 1956, and the RICO statute, id.S 1961, which carry even more substantial penalties. In treating gambling offenses in this way, Congress has plainly concluded that certain gambling offenses are serious crimes,[7] and it is not for us to review the correctness of this evaluation.

_____

7. In reaching this conclusion, Congress was undoubtedly influenced by its recognition that gambling has historically provided a major source of revenue for organized crime groups. See President's Commission on Organized Crime, The Impact: Organized Crime Today 12-13 (1986); President's Commission on Law Enforcement Administration of Justice, The Challenge of Crime in a Free Society 188 (1967); cf. The National Gambling Impact Study Commission Act, Pub. L. 104-169, 110 Stat. 1482 (1996) (establishing federal commission to conduct a comprehensive study of the social and economic impacts of gambling in the United States).

In sum, we reject the defendants' argument that the video surveillance in this case violated their Fourth Amendment rights on the ground that the offenses under investigation were insufficiently serious to justify the use of this intrusive investigative tool.

B. The defendants next assert that the video surveillance of the Fifth Avenue premises failed to meet Title III's requirement that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or are too dangerous." See 18 U.S.C. S 2518(3)(c). Specifically, the defendants argue that the application was defective because it did not state why electronic oral interception could not have been used before resorting to video surveillance. As a result, they argue that the video surveillance violated the Fourth Amendment as well.

In Title III cases, courts have consistently held that 18 U.S.C. S 2518(3)(c) does not require the government to exhaust all other investigative procedures before resorting to electronic surveillance. See United States v. Barnes, 47 F.3d 963, 965 (8th Cir. 1995); Falls, 34 F.3d at 682; Mesa-Rincon, 911 F.2d at 1443; United States v. Apodaca, 820 F.2d 348, 350 (10th Cir.), cert. denied, 484 U.S. 903 (1987); United States v. Webster, 734 F.2d 1048, 1055 (5th Cir.), cert. denied sub nom., Hoskins v. United States, 469 U.S. 1073 (1984). Rather, it is sufficient if there is evidence that "normal investigative techniques . . . reasonably appear to be unlikely to succeed if tried." 18 U.S.C. S 2518(3)(c). "The government need only lay a `factual predicate' sufficient to inform the judge why other methods of investigation are not sufficient." United States v. McGlory, 968 F.2d 309, 345 (3d Cir.) (quoting United States v. Armocida, 515 F.2d 29, 38 (3d Cir.), cert. denied sub nom., Conti v. United States, 423 U.S. 858 (1975)); cert. denied sub nom., Hauser v. United States, 506 U.S. 956 (1992). Furthermore, in determining whether this requirement has been satisfied, a court "may properly take into account affirmations which are founded in part upon the experience of specially trained agents." United States v. Ashley, 876 F.2d 1069, 1072 (1st Cir. 1989); see also United States v. Landmesser, 553 F.2d 17, 20 (6th Cir.), cert. denied, 434 U.S. 855 (1977). "The

11

government's showing is to be `tested in a practical and commonsense fashion.' " McGlory, 968 F.2d at 345 (quoting United States v. Vento, 533 F.2d 838, 849 (3d Cir. 1976)).8

Since the defendants contend that the Fourth Amendment should be held to require compliance with 18 U.S.C. S 2518(3)(c) in video surveillance cases, we see no reason why the rules developed in cases in which that provision is directly applicable should not be applied here as well, and it appears that other courts of appeals in video surveillance cases have taken on this approach. Our review of those cases shows that the inadequacy of other investigative techniques has been proven by demonstrating such factors as the inability of a confidential informant to gather additional information, the futility of electronic oral surveillance where the crime was being committed in silence, the use of evasive tactics by the investigation's targets, and the difficulty of penetrating an organization with a secretive nature and a propensity towards violence.

For example, in Falls, the affidavit stated that a government informant who had been successful in getting information in the past would no longer be helpful because she was not privy to the drug distribution group's sources, the extent of the operation, or its method of distributing the proceeds. 34 F.3d at 677. The affidavit further stated that her access to the group's meeting place was limited by safety concerns. Id. The affidavit named and discussed a total of seven investigative techniques that had been tried or appeared too dangerous or unlikely to succeed in light of the drug conspiracy's secretive nature and propensity towards violence. Id. at 683. These affirmations were held to be sufficient to demonstrate the inadequacy of other investigative techniques. Id.

In Mesa-Rincon, the government submitted an affidavit asserting that audio surveillance was not feasible because the crime, counterfeiting, could be committed without oral communication and because the noise of the printing presses drowned out any conversation. 911 F.2d at 1444. The affidavit also stated that interrogation and infiltration

_____

8. Our standard of appellate review is plenary. United States v. McGlory, 968 F.2d at 345.

12

of the operation were not viable alternatives, because either technique would have aroused suspicion and prevented the successful completion of the investigation. Id. In addition, the affidavit asserted that a traditional search would likewise have been unfruitful, because it was "quite likely that the key evidence of actual counterfeit bills might not be found." Id. at 1445. Under these circumstances, the

court held that the government had satisfactorily demonstrated that other investigative techniques were inadequate. See also Biasucci, 786 F.2d at 511 (affidavit sufficient because it showed that some confidential sources refused to testify, the undercover agent was not permitted to be present at alleged loansharking transaction and at meetings at the defendants' business premises, interviews with victims were not feasible, search warrants and grand juries were not expected to produce significant evidence, and prior victims would be unlikely to testify for fear of reprisals); Torres, 751 F.2d at 877 (affidavit sufficient because it showed that FBI had reason to believe that the people involved in the bomb construction operation, fearing that they might be bugged, played the radio loudly when they were speaking to one another, spoke in code, and built the bombs in silence).

In the instant case, the affidavit stated that execution of a search warrant was unlikely to succeed because it would reveal the facts of the investigation to the targets. A. 55. The affidavit noted that the probable cause affidavit would have to be attached to the warrant when it was executed and that this would cause the targets to take defensive measures, which would impede the progress of the investigation. A. 55. The affidavit also stated that since organizations such as the one involved in this case are highly suspicious of unfamiliar persons, the use of another confidential informant would not have been fruitful. A. 56. The affidavit stated that the confidential informant who had been used previously, as well as physical surveillance and the gathering of law enforcement intelligence information, had been utilized to the fullest extent possible and that any further use of such techniques might result in discovery. A. 59. The affidavit noted that the organization transacted its business in private and via cellular phones, making it difficult to investigate the organization and learn the

13

identities of upper echelon figures. A. 57-60. The affidavit noted that the informant had said that some type of electronic detection equipment might have been installed to alert the targets to surveillance attempts. A. 58. Finally, the affidavit stated:

> Video surveillance is being requested in order to further assist in identifying those subjects involved in this alleged criminal activity. As enumerated within this affidavit, there have been occasions where numerous persons have been observed within the building at one time. Video surveillance will enable investigators to identify those subjects intercepted,

rather than attempting identification through less exact means such as voice exemplars. In addition, video surveillance will disclose any non-verbal criminal activity, such as any actual "settle up" of monies between those subjects monitored in this investigation.

A. 62. We believe that the affidavit provided a sufficient "factual predicate" for a finding that "normal investigative techniques" (i.e., techniques other than video surveillance) were unlikely to succeed. We also conclude that the affidavit, read in a "practical and commonsense fashion," sufficiently showed the need for video surveillance. There was probable cause to believe that what was occurring at the premises was the actual operation of an illegal gambling business, not simply conversations about or in furtherance of that business. Thus, as was the case in Mesa-Rincon, audio surveillance alone was not likely to disclose the identities of all of the participants and what they were doing. While it would not be advisable to use the application as a model in future video surveillance cases, we hold that it satisfies constitutional requirements under the circumstances here. We therefore affirm the district court's denial of defendants' suppression motion on this ground.

III.

The defendants argue that the search of the Foxcroft Road residence belonging to Adolph Williams violated the Fourth Amendment because the information used to

14

establish probable cause was stale and remote. The defendants contend that very little of the information contained in the supporting affidavit demonstrated a nexus between the gambling operation and the Foxcroft Road residence, and they argue that any information suggesting such a connection was obtained from a confidential informant who ceased working for the principals in the mid-1980's. Thus, the defendants contend, the information was stale.

Probable cause is determined by a "totality-of-the-circumstances analysis," under which a magistrate judge must "make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). In reviewing such a determination, our role is quite limited. We must simply decide whether the magistrate judge had a

substantial basis for concluding that probable cause existed. United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993), cert. denied, 510 U.S. 1177 (1994). Therefore, "a reviewing court is to uphold the warrant as long as there is a substantial basis for a fair probability that evidence will be found." Id. (footnote omitted).

The supporting affidavit to a search warrant application must be read in its entirety and in a common sense and nontechnical manner. Id. at 1206. The affidavit need not contain direct evidence that proof of wrongdoing would be present at the premises. Id. at 1207. "Instead, probable cause can be, and often is, inferred by `considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide [the] property.' " Id. (quoting United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993)). The focus should be on what the affidavit includes, rather than on what it does not include. Id. at 1208.

The age of the information supporting a warrant application is a factor that must be considered in determining probable cause. United States v. Harvey, 2 F.3d 1318, 1322 (3d Cir. 1993). If information is too old, it may have little value in showing that contraband or

evidence is still likely to be found in the place for which the warrant is sought. Id. Age alone, however, does not determine staleness. "The likelihood that the evidence sought is still at the place to be searched depends on a number of variables, such as the nature of the crime, of the criminal, of the thing to be seized, and of the place to be searched." United States v. Tehfe, 722 F.2d 1114, 1119 (3d Cir. 1983), cert. denied sub nom., Sanchez v. United States, 466 U.S. 904 (1984). "[W]hen an activity is of a protracted and continuous nature, `the passage of time becomes less significant.' " Id. (quoting United States v. Harris, 482 F.2d 1115, 1119 (3d Cir. 1973)). Thus, when the criminal activity has been going on continuously for years, staleness is of less concern. Id. at 1120 (staleness did not negate probable cause in drug trafficking conspiracy that had been going on for several years).

In this case, the gambling operation began in the 1960's and continued through the 1990's. In light of its long and continuous operation, staleness is less important in the probable cause analysis. See Tehfe, 722 F.2d at 1120. The affidavit submitted in support of the warrant application contained information, obtained from the confidential informant and from physical surveillance, that suggested

that gambling evidence would be found at the Foxcroft Road residence. The affidavit also related various electronically intercepted statements made at the Fifth Avenue premises that indicated that evidence would likely be found at the Foxcroft Road residence.

The confidential informant, who had worked with the defendants for several years until the mid-1980's, reported that he knew of secret hiding places in the residence. Jt. App. 499.9 He also reported that Adolph Williams had once told him about a hidden room in the basement of the house that was used to conceal records. Jt. App. 499. The informant stated that he knew through conversations with other individuals involved in gambling that Adolph Williams was still running the operation. Jt. App. 499. Electronic surveillance conducted in July 1991 revealed that Salvatore

_____

9. "Jt. App." refers to the appendix submitted on behalf of Salvatore C. Williams and Adolph Williams.

16

C. Williams expressed concern about leaving money at the Fifth Avenue premises, and Adolph Williams stated that he would take the money home with him. Jt. App. 494. Physical surveillance conducted between December 1992 and April 1993 revealed that an individual took a pouch believed to contain numbers slips on a twice-daily basis from a gym located on Fifth Avenue to another location and then to the Foxcroft Road residence, where he would stay for up to one hour. Jt. App. 501-05. Thus, the surveillance, which ended in April 1993, indicated that the suspected criminal activity continued until at least a few weeks before the search was conducted on May 25, 1993. The fact that evidence of the suspected criminal activity continued up through the last weeks before the search strongly suggests that the information in the affidavit was not stale.

In light of the protracted nature of this criminal enterprise, we conclude that the magistrate judge had a substantial basis for concluding that there was probable cause to believe that records, numbers slips, or large amounts of money would be found at the Foxcroft Road residence. As the government points out, "[t]he primary evidence sought was records, which are generally created for the very purpose of preservation." Govt. Br. at 45. The informant's information regarding a secret room in the basement also provided support for a probable cause finding, since it is likely that the use of such a permanent and specialized feature would continue for a lengthy period. Furthermore, the daily movement of an individual with a

bag from a Fifth Avenue location to the Foxcroft Road residence strongly suggested that the contents of that bag, believed to be gambling receipts, might be found at the residence. For these reasons, we see no basis for overturning the magistrate judge's probable cause determination.

Moreover, even if we held that probable cause was lacking, suppression of the evidence obtained pursuant to the warrant would not be justified under United States v. Leon, 468 U.S. 897 (1984). Although the defendants maintain that the affidavit in this case was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," id. at 923 (citation

17

omitted), that argument is patently wrong. We therefore affirm the district court's denial of defendants' motion to suppress the evidence obtained as a result of the search of the Foxcroft Road residence.

IV.

The defendants argue that the district court should have dismissed counts one and two of the indictment on equal protection grounds. These counts charged that the defendants conspired to and did in fact violate 18 U.S.C. S 1955 by conducting a gambling business in violation of a Pennsylvania statute, 18 Pa. Cons. Stat. Ann.S 5514, that prohibits "pool selling," "bookmaking," and related activities. The defendants contend that this Pennsylvania statute violates the Equal Protection Clause because it prohibits some forms of gambling while other state laws authorize other forms of gambling such as the state lottery. Taken together, the defendants maintain, these laws create a disparity of treatment between "entities which engage in state-authorized gambling" and "entities which engage in gambling not authorized by the state." Jt. Br. at 36. The defendants contend that 18 Pa. Cons. Stat. Ann.S 5514 is subject to strict scrutiny because it "impinges upon the exercise of certain fundamental rights," namely,"the right to hold specific private employment," "the right to enter contracts," and "the right of association for economic and social reasons." Id. at 36. The defendants argue that the only interest ever served by 18 Pa. Cons. Stat. Ann.S 5514 was "preventing the inflammation of the gambling instinct," that the Commonwealth no longer views this as an important interest and indeed now has an interest in "encouraging the gambling instinct" (id. at 29), and that therefore 18 Pa. Cons. Stat. Ann. S 5514 cannot survive any degree of equal protection scrutiny.

Before addressing the merits of defendants' equal protection argument, we must determine the standard that governs our analysis. "[A]s a general matter, economic and social legislation is subject to rational basis review, under which a law need only be rationally related to a legitimate state interest." Tolchin v. Supreme Court of New Jersey, 111 F.3d 1099, 1113 (3d Cir. 1997) (internal quotations

omitted). However, suspect classifications, such as those based on race, national origin, or alienage, and "classifications affecting fundamental rights are given the most exacting scrutiny." Clark v. Jeter, 486 U.S. 456, 461 (1988) (citation omitted). Such laws must be "suitably tailored to serve a compelling state interest." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985); see also Artway v. Attorney General of New Jersey , 81 F.3d 1235, 1267 (3d Cir. 1996).

For equal protection purposes, "fundamental rights" include such constitutional rights as the right of interstate travel, Shapiro v. Thompson, 394 U.S. 618 (1969), the right to vote, Bullock v. Carter, 405 U.S. 134 (1972), rights guaranteed by the First Amendment, Williams v. Rhodes, 393 U.S. 23 (1968), and the right to procreate, Skinner v. Oklahoma, 316 U.S. 535 (1942). See Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 312 n.3 (1976) (per curiam). However, the rights asserted by the defendants here do not qualify for strict scrutiny.

As noted, the defendants claim that 18 Pa. Cons. Stat. Ann. S 5514 affects their "right to hold specific private employment." However, it is settled that laws restricting access to specific types of private employment are subject to only rational basis review. See, e.g., Leis v. Flynt, 439 U.S. 438, 444 n.5 (1979) (practice law); Schware v. Board of Bar Examiners, 353 U.S. 232 (1957) (same); Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483 (1955) (fitting or duplicating eyeglass lenses); Kotch v. Board of River Port Pilot Comm'rs, 330 U.S. 552 (1947) (pilotage of vessels); see also Edelstein v. Wilentz, 812 F.2d 128, 132 (3d Cir. 1987) ("The Constitution does not create fundamental interests in particular types of employment."). Thus, we cannot subject 18 Pa. Cons. Stat. Ann. S 5514 to strict scrutiny on this basis.

Nor is strict scrutiny justified on the ground that this provision affects the defendants' right to enter into contracts (whether wagering contracts or other contracts related to the operation of a gambling business) or on the

ground that it affects their "right of association for economic and social reasons." Jt. Br. at 29. All laws restricting access to particular types of private employment

have these effects. For example, in Williamson , a state statute permitted only licensed optometrists and opthamologists to fit or duplicate eyeglass lenses. Not only did this law affect the ability of persons not within the favored groups to obtain this particular type of private employment, but it also affected their ability to enter into a variety of contracts, such as contracts of employment to fit or duplicate lenses and contracts with customers for the fitting or duplication of lenses. Likewise, the law challenged in Williamson affected the ability of persons not in the favored groups to associate with others for the purpose of fitting or duplicating lenses. Yet the Supreme Court subjected the law at issue in Williamson to only rational basis review. See 348 U.S. at 489. We are therefore persuaded that this same standard of review applies here.

Under this standard, "a law need only be rationally related to a legitimate state interest," Tolchin, 111 F.3d at 1113 (internal quotation omitted), and 18 Pa. Cons. Stat. Ann. S 5514 easily satisfies this requirement. In prohibiting certain gambling activities but not others, Pennsylvania lawmakers could have rationally concluded that the prohibited activities are particularly undesirable-- because they have an increased tendency to encourage self-destructive behavior, because they are especially susceptible to the dishonest practices and organized crime connections that have historically plagued the gambling business, or for other reasons. As the Court wrote in Williamson:

> Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others.

348 U.S. at 489 (citations omitted); see also Commonwealth v. Hainsey, 550 A.2d 207, 209 (Pa. Super. Ct. 1988) (rejecting argument that enforcement of 18 Pa. Con. Stat. Ann. S 5514, prohibiting pool selling and bookmaking, is unjust because the Commonwealth promotes the state lottery and condones wagering at rack tracks; S 5514 was

"enacted as a legitimate exercise of legislative authority."). We conclude that S 5514 is rationally related to a legitimate state interest, and we therefore reject the defendants' equal protection challenge.

V.

The defendants next argue that the oral evidence electronically intercepted from the Fifth Avenue premises should have been suppressed because the Pennsylvania statute under which the authorization was obtained does not comply with 18 U.S.C. S 2518. The defendants contend that the state statute is deficient in that it permits a law enforcement officer to swear out the supporting affidavit used to establish that there is probable cause for the interception and that other investigative procedures are inadequate. The defendants maintain that the federal statute requires "the attorney for the government" to make such assertions. SAW Br. at 12. This distinction is critical, the defendants contend, because approval and oversight by government attorneys provides an `administrative check' to avoid arbitrary invasions of privacy rights by government officials." Id. at 13.

The defendants' argument is based on a misreading of the relevant provisions of Title III. When an order permitting electronic interception of wire or oral communications is sought in federal court, the application must be authorized by certain high-ranking Justice Department officials, 18 U.S.C. S 2516(1), but the application need not be made by a government attorney. Section 2518(1) provides in pertinent part:

> Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

> (a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

21

> (b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify

his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) . . . a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . .

18 U.S.C. S 2518 (emphasis added).

As is evident from the highlighted language, S 2518 does not require that an application be made by an attorney; instead, such an application may be made by an "investigative or law enforcement officer." Nor does S 2518 require a statement by a government attorney regarding the attorney's belief that an interception order should be issued; instead, the statute requires a statement regarding the applicant's belief that such an order should be issued, as well as "a full and complete statement" (by someone, presumably including the applicant) as to the inadequacy of other investigative techniques. Thus, there is no textual requirement that an attorney for the government make these statements, as the defendants contend.

The defendants cite no case law supporting the proposition that a law enforcement officer's affidavit is insufficient in a case in which federal court approval for wiretapping or bugging is sought, and we have found no such case. To the contrary, affidavits sworn out by law enforcement officers have been held to be sufficient. See, e.g., United States v. Kahn, 415 U.S. 143, 144 n.1 (1974) (affidavit of FBI special agent); United States v. Falls, 34 F.3d 674, 676 (8th Cir. 1994) (affidavit of FBI special agent); United States v. Ashley, 876 F.2d 1069, 1071 (1st Cir. 1989) (affidavit of DEA special agent).

22

The Pennsylvania statute pursuant to which the application in this case was made provides:

Each application for an order of authorization to intercept a wire or oral communication shall be made in writing upon the personal oath or affirmation of the Attorney General or a district attorney of the county

wherein the interception is to be made and shall
contain all of the following:

(1) A statement of the authority of the applicant to
make such application.

(2) A statement of the identity and qualifications of
the investigative or law enforcement officers or agency
for whom the authority to intercept a wire or oral
communication is sought.

(3) A sworn statement by the investigative or law
enforcement officer who has knowledge of relevant
information justifying the application, which shall
include:

 (i) The identity of the particular person, if known,
committing the offense and whose communications are
to be intercepted.

 (ii) The details as to the particular offense that has
been, is being, or is about to be committed.

. . .

 (iv) A showing that there is probable cause to
believe that such communication will be committed on
the wire communication facility involved or at the
particular place where the oral communication is to be
intercepted.

. . .

 (vii) A particular statement of facts showing that
other normal investigative procedures with respect to
the offense have been tried and have failed, or
reasonably appear to be unlikely to succeed if tried or
are too dangerous to employ.

18 Pa. Cons. Stat. Ann. S 5709 (emphasis added). Thus,
under the Pennsylvania scheme, the application must be

23

made by the Attorney General or a district attorney and
must be supported by an affidavit of a law enforcement
officer.

As we have noted, when a federal court order is sought,
18 U.S.C. S 2518(1) does not require that a government
attorney execute the affidavit used to establish probable
cause and the inadequacy of other investigative techniques,

and we are not persuaded that Title III demands anything more when an application is made to a state court. Under 18 U.S.C. S 2516(2), such an application must be made by a state's "principal prosecuting attorney" or by "the principal prosecuting attorney of any political subdivision thereof," and the judge may grant the application"in conformity with" S 2518. We do not interpret this provision to require that an attorney make the statement supporting probable cause or the inadequacy of other investigative techniques. See United States v. Smith, 31 F.3d 1294, 1298 (4th Cir. 1994) (affidavit of police officer), cert. denied, 115 S. Ct. 1170 (1995); United States v. Homick, 964 F.2d 899, 903 (9th Cir. 1990) (affidavit of detective); United States v. Young, 822 F.2d 1234, 1237 (2d Cir. 1987) (affidavit of state police detective).

Furthermore, it is apparent that when the Attorney General of Pennsylvania or a district attorney submits an application to a state court and relies on an affidavit of a law enforcement officer, the Attorney General or district attorney, as an officer of the court, is implicitly representing that it is his or her belief that there is probable cause for the surveillance and that other investigative techniques are inadequate. To be sure, the Attorney General or district attorney makes that implicit representation in reliance on the law enforcement officer's affidavit, but the same type of reliance would almost certainly occur even if the Attorney General or district attorney were to execute the affidavit. Statements made by an affiant submitted in support of a warrant may be based on information provided by others, see Illinois v. Gates, 462 U.S. at 238, and it is unrealistic to expect that a state attorney general or district attorney will routinely acquire sufficient firsthand information about the grounds for a warrant application so as to be able to base his or her affidavit on anything other than information

24

relayed by field investigators and their supervisors. Thus, we do not agree with the defendants that the Pennsylvania scheme eliminates an important "administrative check."

VI.

The defendants contend that electronically intercepted evidence from the Fifth Avenue premises was disclosed to a federal grand jury in violation of provisions of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. Ann. SS 5717(a) and 5718, and that therefore this evidence should have been suppressed.10 As we understand the defendants' argument, it runs as follows. The order signed by the Superior Court

judge authorized the interception of conversations relating to certain state offenses, viz., "offenses involving Corrupt Organizations, 18 Pa. C.S. S 911; Lotteries, 18 Pa. C.S. S 5512; and/or Conspiracy to commit the aforesaid violations in violation of 18 Pa. C.S[.] S 903." Jt. App. 80. Under 18 Pa. Cons. Stat. Ann. S 5718, when an authorized interception of wire or oral communications intercepts "communications relating to offenses other than those specified in the order of authorization," these communications and evidence derived from them may be disclosed before a federal grand jury only if an application to a court is made and the court makes certain findings "in advance of such disclosure." Here, the government

_____

10. The defendants also contend that evidence was improperly disclosed to agents of the Internal Revenue Service's Criminal Investigation Division, but the defendants do not explain the basis for this argument. Under 18 U.S.C. S 2517(1), the Pennsylvania State Troopers authorized by court order to intercept oral communications were permitted to disclose the contents "to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure." See United States v. Iannelli , 477 F.2d 999, 1001 (3d Cir. 1973) ("These Internal Revenue Service agents are investigative or law enforcement officers within the meaning of 18 U.S.C. S 2510(7) and disclosure was appropriate to the performance of their duties."), aff 'd, 420 U.S. 770 (1975). Therefore, based on the brief treatment given to the issue of disclosure of evidence to IRS agents in the defendants' briefs, we
see no ground for holding that this disclosure was improper.

25

acknowledged that portions of the intercepted communications were presented to a federal grand jury without a prior authorization order. See Govt. Br. at 18-19. Based on these facts, the defendants argue that this disclosure violated 18 Pa. Cons. Stat. Ann. S 5718, that suppression was required under Commonwealth v. Hashem, 584 A.2d 1378 (Pa. 1991), and that this state rule of suppression is applicable in this federal case because "a Title III type interception conducted under State law and proposed to be used in a federal court must meet any state standards which are `more demanding than federal ones' in the district in which the offer is made." SAW Br. at 14-15 (quoting United States v. Geller, 560 F. Supp. 1309, 1312 (E.D. Pa. 1983), aff 'd, 745 F.2d 49 (3d Cir. 1985) (table)).

It appears that the defendants are arguing that Title III requires suppression when communications are intercepted pursuant to a state statute and are subsequently disclosed

in violation of state law. However, it is also possible that the defendants are arguing that the suppression remedy provided by state law is directly applicable under these circumstances in a federal case. We will therefore address both arguments.

A. In considering the question of suppression under federal law, two statutory provisions must be taken into account. The first, 18 U.S.C. S 2515, states:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

Id. (emphasis added). The second, 18 U.S.C.S 2518 (10)(a) provides, in pertinent part, as follows:

> Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision

26

> thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that --
>
>  (i) the communication was unlawfully intercepted;
>
>  (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
>
>  (iii) the interception was not made in conformity with the order of authorization or approval.

The Supreme Court has explained the relationship between these two provisions. In United States v. Giordano, 416 U.S. 505, 524 (1974), the Court wrote that "[w]hat disclosures are forbidden [under S 2515], and are subject to motions to suppress, is . . . governed by S 2518(10)(a)." Thus, evidence may be suppressed only if one of the grounds set out in S 2518(10)(a) is met. Moreover, " `[not] every failure to comply fully with any requirement provided in Title III would render the interception of wire or oral

communications "unlawful" ' " underS 2518(10)(a)(i). United States v. Donovan, 429 U.S. 413, 433 (1977) (quoting United States v. Chavez, 416 U.S. 562, 574-75 (1974)). Rather, suppression is mandated "only for a `failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.' " Donovan, 429 U.S. at 433-34 (quoting Giordano, 416 U.S. at 527).

Construing these statutory provisions, our court held more than 20 years ago that Title III does not prescribe suppression as a remedy for a disclosure violation. United States v. Iannelli, 477 F.2d 999, 1001 (3d Cir. 1973), aff 'd, 420 U.S. 770 (1975). We wrote that "the suppression remedy specified in 18 U.S.C. S 2518(10) applies to unlawful interceptions. A civil remedy applies to unlawful disclosures. 18 U.S.C. S 2520." Id.; see also United States v. Vento, 533 F.2d 838, 855 (3d Cir. 1976). Other courts of appeals have reached the same conclusion. See, e.g., United States v. Barnes, 47 F.3d 963, 965 (8th Cir. 1995); Resha v. United States, 767 F.2d 285, 288 (6th Cir. 1985) ("we

27

construe S 2518 to permit suppression of evidence only if that evidence was derived from unlawful, improper or unauthorized interceptions of wire or oral communications. It does not authorize suppression for disclosures of such information, even if they violate S 2517.") (emphasis in original), cert. denied, 475 U.S. 1081 (1986).11

Iannelli and Vento are binding on us here, and in any event we see no basis for questioning their reasoning. The section of Title III governing suppression, 18 U.S.C. S 2518(10), sets out three grounds for suppression, and none of these grounds applies to evidence that is intercepted lawfully but that is later disclosed improperly. For improper disclosure, Title III instead authorizes a civil remedy. See 18 U.S.C. S 2520(a).12

If the defendants based their argument on an alleged violation of federal nondisclosure requirements, the authorities cited above would be directly controlling, but the defendants have attempted to weave their way around these obstacles by contending that suppression is required because a state nondisclosure provision was violated and because the Pennsylvania Supreme Court held in Hashem that evidence disclosed in violation of that provision must be suppressed. The defendants point out that under 18 U.S.C. S 2516(2), an authorization order signed by a state

_____

11. We are not persuaded by the defendants' reliance on United States v. Marion, 535 F.2d 697, 703-04 (2d Cir. 1976), and United States v. Brodson, 528 F.2d 214 (7th Cir. 1975). Insofar as these cases suppressed evidence based on violations of the nondisclosure restrictions in 18 U.S.C. S 2517(5), these decisions are contrary to controlling precedents of our court.

12. This provision provides, in pertinent part, as follows:

     Except as provided in section 2511(2)(a)(ii), any person whose
wire,
     oral, or electronic communication is intercepted, disclosed, or
     intentionally used in violation of this chapter may in a civil
action
     recover from the person or entity which engaged in that violation
     such relief as may be appropriate.

18 U.S.C. S 2520(a) (emphasis added). The exception set out in 18 U.S.C. S 2511(2)(a)(ii) applies to "providers of wire or electronic communication service" and certain persons associated with them. It thus has no application here.

28

judge must be "in conformity with [18 U.S.C.S] 2518 . . . and with the applicable State statute," and the defendants rely on cases holding that suppression is required in federal court when state officers intercept communications in violation of the applicable state statute. See United States v. Butz, 982 F.2d 1378, 1383 (9th Cir.), cert. denied, 510 U.S. 891 (1993); United States v. Vario, 943 F.2d 236, 244 (2d Cir. 1991), cert. denied, 502 U.S. 1036 (1992); United States v. Bascaro, 742 F.2d 1335 (11th Cir. 1984), cert. denied sub nom., Hobson v. United States, 472 U.S. 1017 (1985); United States v. Brown, 872 F.2d 385, 388-90 (11th Cir.), cert. denied, 493 U.S. 898 (1989).

We are not persuaded by the defendants' attempts to circumvent Iannelli and Vento. We understand these precedents to rest on the proposition that 18 U.S.C. S 2518(10)(a) sets out the exclusive grounds for suppression under Title III but omits any reference to disclosure violations. Since this provision makes no mention of federal or state disclosure violations, we see no basis for holding that this provision authorizes suppression for state, but not federal, disclosure violations.

Whether the Pennsylvania courts would have ordered suppression under Hashem makes no difference. We will discuss below the question whether the Pennsylvania

suppression rule is directly applicable in this federal case. At present, we are addressing the question whether federal law requires suppression, and the defendants have not called to our attention any provision of Title III that requires or authorizes the suppression of evidence in federal court simply because a state court would have ordered suppression as a remedy for a violation of the state disclosure provision. Nor are we aware of any such federal statutory provision. Without such a provision, we see no basis for holding that federal law requires suppression here simply because the Pennsylvania courts might have required suppression in a state prosecution. Accordingly, we hold that federal law does not require suppression of the evidence that, according to the defendants, was unlawfully disclosed.

B. We therefore turn to the question whether Pennsylvania law of its own force requires suppression in

29

this case. It clearly does not. "It is a general rule that federal district courts will decide evidence questions in federal criminal cases on the basis of federal, rather than state, law." United States v. Rickus, 737 F.2d 360, 363 (3d Cir. 1984); see also, e.g., United States v. Stiver, 9 F.3d 298 (3d Cir. 1993), cert. denied, 510 U.S. 1136 (1994); United States v. Shaffer, 520 F.2d 1369, 1372 (3d Cir. 1975), cert. denied sub nom., Vespe v. United States, 423 U.S. 1051 (1976); United States v. Armocida, 515 F.2d 49, 52 (3d Cir.), cert. denied, 423 U.S. 858 (1975). Moreover, the relevant state statutory provision, 18 Pa. Cons. Stat. Ann.S 5721(a), does not purport to govern federal cases. It provides that a motion to suppress may be made "in any trial, hearing, or other adversary proceeding in or before any court or other authority of this Commonwealth." 18 Pa. Cons. Stat. Ann. S 5721(a) (emphasis added).

For these reasons, assuming for the sake of argument that evidence was disclosed in violation of state law, we hold that the district court did not err in refusing to suppress that evidence.13

VII.

The defendants next argue that the electronically intercepted oral evidence from the Fifth Avenue premises should have been suppressed because the affidavit did not indicate that normal investigative procedures would be inadequate, as required by 18 U.S.C. S 2518(3)(c). The defendants maintain that the confidential informant could have been further utilized in lieu of electronic surveillance.

As we have stated, the affidavit submitted with the oral surveillance application was the same as that submitted with the video surveillance application, the sufficiency of

_____

13. The government makes two additional arguments in support of its position on this issue. It argues that the disclosed communications were relevant to the state offenses listed in the interception order and that the
state judge implicitly authorized disclosure to federal authorities by granting an extension of the interception order and granting an order authorizing postponement of service of inventory. Because we conclude that suppression is not an available remedy for unlawful disclosure, we do not reach these arguments.

which has already been discussed. See supra Part II(B). Accordingly, we will not address this argument again at this point. We note only that the informant had ceased working for the organization approximately six years before the affidavit was prepared, and therefore the probability of his continued effectiveness as an informant was low.

VIII.

Defendants additionally challenge the affidavit in support of the extension of the oral interception order for the Fifth Avenue premises, arguing that there was no basis to conclude that continuing the interception would produce any additional information. Extensions require the same showing as an initial application. 18 U.S.C. S 2518(5). Thus, the same determinations as to probable cause and the inadequacy of other investigative procedures must be made. Id. S 2518(3).

The affidavit submitted in support of the extension request stated that continued interception was needed because successful interception of conversations had been limited due to background radio noise. A. 131. The affidavit also stated that it was believed that the defendants were playing the radio for the purpose of thwarting the attempt by police to listen to conversations. Id. However, the affidavit added that those conversations that were audible indicated that defendants were involved in an illegal gambling operation. Id. The affidavit further stated that one of the participants in the operation, Louis Esposito, whose telephones had previously been wiretapped, was approached by police in an attempt to gain his cooperation in investigating defendants. A. 140. Shortly after the interview, the affidavit revealed, Esposito informed Adolph Williams of the interview and told him that the police were

investigating the operation. Finally, the affidavit stated that the police had attempted further physical surveillance of the Fifth Avenue premises but that surveillance teams had reported that many of the targets were using evasive tactics, such as circling the block, switching lanes, and running red lights after waiting for the green light to turn red, in order to prevent anyone from following them through the intersection. A. 145. The affidavit indicated

that investigators were in the process of determining whether a mobile tracking device would assist in the surveillance of key targets and that the investigators were also exploring the feasibility of aerial surveillance. A. 145-46.14 Based on these representations, we believe the government made an adequate showing of probable cause and lack of alternative investigative means to justify the extension of the surveillance order. We therefore hold that the district court's denial of defendants' motion to suppress evidence obtained during the extension was proper.

IX.

Finally, the defendants argue that the electronically intercepted oral evidence from the Fifth Avenue premises should have been suppressed because the tapes were not sealed in accordance with federal and state law. The interception ended on Friday, August 9, 1991, but the tapes were not sealed until Monday, August 12, 1991. The district court found that the tapes were sealed as soon as practical after the intervening weekend and denied the motion to suppress.

_____

14. The affidavit states:

    Your affiants believe that while there has been progress throughout
    the course of this interception, that a further period of interception
    will be required to identify the relationships and responsibilities of
    the parties already identified and to identify other participants in
    this organization. As previously stated, this investigation is unusual
    in that many of the subordinate parties had not been previously
    identified as to identity and also as to activity. Due to the short and
    abrupt nature of the majority of the conversations intercepted to
    date, further interceptions are necessary to be able to establish
    beyond a reasonable doubt, the sources of the cash which is flowing

through this building. Because of the nature of the conversations, much of the evidence will be of a circumstantial nature. This is especially true because of the documented efforts of these individuals to avoid detection by: evasive tactics, including their driving patterns; playing of loud music within the area of interception, and shredding of physical evidence such as those papers believed to contain documentation as to the amount of money which flows through this organization.

A. 148-49.

Federal and Pennsylvania law require the sealing of recordings "[i]mmediately" upon the expiration of the surveillance order or any extensions of such order. See 18 U.S.C. S 2518(8)(a); 18 Pa. Cons. Stat. Ann.S 5714(b). Section 2518(8)(a) contains "an explicit exclusionary remedy for noncompliance with the sealing requirement." United States v. Ojeda Rios, 495 U.S. 257, 263 (1990). If the tapes are not immediately sealed upon expiration of the order, the government must not only explain why a delay occurred but must also explain why the delay was excusable. Id. at 264-65. The term "[i]mmediately" means that the tapes should be sealed either as soon as practical after the surveillance ends or as soon as practical after the final extension order expires. United States v. Vastola, 915 F.2d 865, 875 (3d Cir. 1990), cert. denied, 498 U.S. 1120 (1991). If the tapes were sealed as soon as practical, our inquiry ends, and the order denying the motion to suppress must be affirmed. United States v. Carson, 969 F.2d 1480, 1491 (3d Cir. 1992). If the tapes were not sealed promptly enough, we must ask whether the government provided an objectively reasonable explanation for the delay. Id.

In Carson, 969 F.2d at 1488, we held that the sealing of certain recordings was immediate within the meaning of the statute where the surveillance was completed at the end of one week and tapes were sealed at the beginning of the next week. One order expired on Wednesday, May 12, 1982, and the tapes were sealed on Monday, May 17, 1982. We held that "[w]hen the intervening weekend is considered, there is no indication in the record that the tapes were not sealed as soon as was practical," and we therefore held that those tapes were sealed "immediately." Id. at 1498. A second order expired on Thursday, December 16, 1982, and the tapes were sealed on Wednesday, December 22, 1982. We held that since the gap included an intervening weekend, those tapes were also sealed "immediately." We accordingly did not reach the issue of whether the government's delay was excusable with respect to either order.

Here, the government learned that the issuing judge, for whom a progress report had been prepared for the purpose of sealing the tapes, was out of town and would be

33

unavailable to seal the tapes on Friday, August 9, 1991, the day the extension would expire. Therefore, on Wednesday, August 7, a request was made for a substitute judge to be appointed, and Judge Kate Ford Elliot was assigned to the case. On Thursday, August 8, the assistant district attorney spoke with Judge Elliot and requested to seal the tapes on Saturday, August 10. Judge Elliot told him that Monday, August 12 would be adequate to seal the tapes, and on Monday, August 12, the tapes were sealed.

We conclude that the tapes were sealed "immediately" for the purpose of the statutory sealing requirement. Under the holding of Carson, where the surveillance ends on Friday and the tapes are sealed on the following Monday, the sealing is immediate in light of the intervening weekend. Furthermore, even if the Monday sealing were not deemed to be immediate, the assistant district attorney's reliance on the judge's decision to wait until Monday was certainly reasonable, and consequently the delay was excusable. The assistant district attorney had previously arranged for a substitute judge in order to comply with S 2518(8)(a) and had deferred to that judge's decision to seal the tapes the following Monday. We believe it would be unreasonable to expect the attorney to seek out a third judge to seal the tapes after Judge Elliot had told him that waiting until Monday would be sufficient.

X.

For the reasons explained above, we affirm the judgments against the defendants.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

34